1

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9   Travis Donovan Hiland,                     No. CV-13-08110-PHX-PGR (BSB)

10                  Petitioner,               **REPORT AND**
                                             **RECOMMENDATION**
11   v.

12   Charles L. Ryan, et al.,

13                  Respondents.

14

15          Travis Donovan Hiland (Petitioner) has filed a Petition for Writ of Habeas Corpus

16   pursuant to 28 U.S.C. § 2254.  (Doc. 1.)  Respondents have filed an Answer asserting that

17   Petitioner's claims are procedurally barred or lack merit (Doc. 15), and Petitioner has

18   filed a reply and a supplemental reply in support of his Petition.[1]  (Docs. 25, 28.)  For the

19   reasons below, the Petition should be denied.

20   **I.      Procedural Background**

21          **A.      Charges**

22          On June 8, 2007, Petitioner and co-defendants Joseph Hiland (Petitioner's father),

23   Tyson Hiland (Petitioner's brother), and Stephen Cottrell were indicted by a Yavapai

24   County Grand Jury on one count of conspiracy to commit theft (Count One), one count of

25   theft (Count Two), one count of fraudulent schemes and artifices (Count Three), and one

26   count of participating in a criminal syndicate (Count Four), all class two felonies.

27   _____

28          [1]   Petitioner also filed an "Erratum" correcting several "misstatements" and
     typographical errors in his reply.  (Doc. 26.)

(Doc. 15, Ex. A.)[2]   Petitioner was charged as Travis Donovan Hiland, DBA Engage Development Company, LLC, Senior Life Asset Management LLC, and/or XYZ Companies 1-10.   (*Id.*)   The indictment alleged that, through a Ponzi-type scheme, Petitioner and his co-defendants obtained funds totaling $1,658,849.71 from over twenty individuals, who were identified as victims in the indictment.[3]   (*Id.*)

### B.   Rule 17.4 hearings

The case was assigned to Superior Court Judge Thomas Lindberg.   (Doc. 15, Ex. B.)   Pursuant to Arizona Rule of Criminal Procedure 17.4, Petitioner and his co-defendants participated in several plea negotiation conferences before Superior Court Judge Robert Brutinel.   (Doc. 15, Exs. C, D, KK, LL.)

Over the course of those conferences, the State offered to allow the defendants to plead guilty to theft and fraudulent schemes in exchange for dismissing the other charges, provided that all of the defendants agreed to plead guilty.   (Doc. 15, Ex. LL at 7-8.)   The State indicated that it would consider recommending a sentencing range of three to twelve-and-a-half years' imprisonment on each charge with the possibility of probation, and that it wanted a judge other than Judge Lindberg to conduct the sentencing.   (Doc. 15, Ex. KK at 12-13.)   The State told Judge Brutinel that it "would be looking for prison with respect to the two [younger] Hilands, but for Joe Hiland . . . [it] would probably" recommend probation because of his poor health.   (Doc. 15, Ex. LL at 9.)   For Petitioner and co-defendant Tyson Hiland, the State said "[w]e want that range of three to 12.5 years. . . I don't know that in the end we would be recommending the maximum, but I don't want to make any promises that anyone relies on as part of the settlement negotiations what our position would be."   (*Id.* at 11.)   The State explained that it wanted a presentence hearing and for the victims to be able to testify.   (*Id.*)

---

[2]   Exhibits A-SS to Respondents' Answer are located at docket 15.   Exhibits TT-BBB are located at docket 16.

[3]   The presentence report details the factual allegations underlying the charges. (Doc. 15, Ex. P.)

Judge Brutinel told Petitioner and his co-defendants that the State was "not willing to make a recommendation [about sentencing] one way or the other," and that they "want to attend the presentence hearing and listen to the victims testify before they make a recommendation." (*Id.* at 11.) Judge Brutinel stated "I don't see [the State] making a specific recommendation. I don't see them agreeing to a cap." (*Id.* at 12.) Judge Brutinel further stated "if [the defendants] wanted to take the offer the State's making, you are kind of looking at the range between three and 12-and-a-half with the possibility of probation. I mean, that's the ball park we are talking about." (*Id.* at 14.) Judge Brutinel reiterated to Petitioner and his counsel that "I don't see them offering you a probation mandatory plea." (*Id.* at 18.) After Petitioner's counsel asserted that Petitioner should be sentenced to probation to facilitate his ability to make a good faith effort on restitution, Judge Brutinel stated:

> "[T]o be perfectly blunt, with all due respect, sir, there's no way in the world you are going to make even a token payment on 1.6 million dollars in restitution and neither is your brother, neither is your dad . . . I just don't see any prospects of you being able to do that under the circumstances.
>
> [The State is] not going to agree to a probation mandatory. I was amazed they were willing to continue with the probation eligible offer.
>
> I think there is a reasonable prospect – you've got a lot of victims in this case. You've got a lot of victims in this case which are, to use the term of art as Judge Lindberg refers to it in his minute entry, vulnerable adults. There is going to be a considerable amount of sympathy and some public pressure to do something fairly serious and particularly given none of these people are likely to see any of their money back.
>
> I don't think it's likely that Judge Lindberg will stack the sentences in this case, but it's possible.
>
> I think he will put you in prison, and I think the prison term is somewhere between the presumptive and maximum in this case. Somewhere between five and 12-and-a-half, and I have to tell you if I was the sentencing judge, it is likely that I would do the same thing. I probably would not put you on probation in this case. I probably would send you to prison.

(*Id.* at 19-20.)

Petitioner, his father, and brother ultimately expressed an interest in accepting the plea offer if Judge Lindberg, who was familiar with the case, remained the sentencing judge.[4]  (Doc. 15, Ex. LL at 26.)  Petitioner's counsel stated that "Travis will probably take the offer you are making with one change, and that change is that Lindberg does the sentencing."  (*Id.* at 29.)  The State agreed to have Judge Lindberg act as the sentencing judge.  (*Id.* at 34.)

On December 22, 2008, during the final Rule 17.4 conference before Judge Brutinel, Petitioner's counsel argued that it could be considered coercive to "have a group of people that are forced to take a unified plea."  (Doc. 15, Ex. LL. at 4.)  The State argued that, pursuant to *State v. Solano*, 724 P.2d 17 (Ariz. 1986), package plea deals were appropriate so long as the court reviewed the totality of circumstances surrounding the plea and ensured it was not coercive.  (*Id.* at 7-8.)  Judge Brutinel acknowledged that a "package plea offer which purports to offer a benefit to a third party does indeed require some extra judicial scrutiny," concluding that under Arizona law, "package deals are okay, but you need to be careful with them."  (*Id.* at 17-18.)  The change of plea was scheduled for the following day, December 23, 2008.  (*Id.* at 35.)

**C.**     **The Plea Agreement and Change of Plea Hearing**

On December 23, 2008, Petitioner, his brother, and father pled guilty to one count of theft in violation of Ariz. Rev. Stat. § 13-1802, a class two felony, and one count of fraudulent schemes in violation of Ariz. Rev. Stat. § 13-2310, a class two felony. (Doc. 15, Ex. F at 1; Ex. MM.)  The remaining counts of the indictment were dismissed. (*Id.* at 3.)

Petitioner's plea agreement provided that "each Class 2 felony carries a presumptive sentence of 5 years; a minimum sentence of 4 years (3 years if the court finds exceptional circumstances); and a maximum sentence of 10 years (12.5 years if the

---

[4]  Co-Defendant Steve Cottrell wanted to proceed to trial.  The State allowed the plea offer to stand, provided all three Hiland defendants entered the plea.  (Doc. 15, Ex. LL at 34.)

Court finds exceptional circumstances)." (*Id.* at 1.) The agreement provided that probation was available "for a term not to exceed 7 years." (*Id.* at 2.) The plea agreement also required the payment of $1,663,849.71 in restitution to the listed victims. (*Id.* at 2.) Petitioner also agreed "to make a factual basis for the change of plea." (*Id.* at 2.)

Pursuant to paragraph seven of the plea agreement, Petitioner "consent[ed] to judicial fact-finding by a preponderance of the evidence as to any aspect or enhancement of sentence." (*Id.* at 4.) That paragraph also stated that Petitioner "completely understand[s] and agree[s] that by entering into this Plea Agreement . . . any sentence either stipulated to or recommended herein [] is not binding on the court." (*Id.*) Paragraph seven further provided that "[i]n making the sentencing determination, the Court is not bound by the rules of evidence." (*Id.* at 4.)

Paragraph eight reiterated that Petitioner understood that the sentencing recommendations in the plea agreement were not binding on the court, and that the court was "bound only by the limits set forth in paragraph 1 and the applicable statutes." (*Id.*) The plea agreement provided that Petitioner had "discussed the case and [his] constitutional rights with [his] lawyer." (*Id.* at 4.)

At the change of plea hearing, Judge Lindberg discussed Petitioner's sentencing exposure and emphasized that the plea agreement permitted it to sentence Petitioner within the range provided for in that agreement:

> If I find both aggravating and mitigating circumstances, the whole range of sentence is available to the Court, from the very minimum to the very maximum. . . . I just want to convey to you the whole range of sentence is open if both aggravating and mitigating circumstances are found.

(Doc. 15, Ex. MM at 11.)

The court and Petitioner then had the following exchange:

> COURT: Travis did you go over the plea agreement and read it completely before signing?
>
> PETITIONER: Yes.

- 5 –

1    * * *

2    COURT: Do you believe you understand the plea agreement,
     Travis?
3
     PETITIONER: Yes.
4
     * * *
5
     COURT: Did [your attorney] explain the plea agreement to
6    you in full before you signed it? Travis?

7    PETITIONER: Yes.

8    * * *

9    COURT: Has anybody made you any promises, guarantees or
     assurances so that you would enter the plea agreement, other
10   than what is contained in the plea agreement itself? Travis?

11   * * *

12   PETITIONER: No.

13   * * *

14   COURT: Has anybody threatened you or forced you or
     coerced you into entering the plea agreement? Travis?
15
     PETITIONER: No.
16
     * * *
17
     COURT: Whether you enter the plea agreement has to be
18   your own individual choice. Travis, do you understand that?

19   PETITIONER: Yes.

20   * * *

21   COURT: I recognize that this was done as a package deal
     inclusive of Joseph Hiland, your father. But do you
22   understand that if you did not wish to enter the plea
     agreement, you don't have to enter the plea agreement?  Is
23   that your understanding, Travis?

24   PETITIONER: I understand

25   * * *

26   COURT: So, Travis, are you entering the plea agreement
     voluntarily of your own free will?
27
     PETITIONER: Yes.
28

- 6 –

* * *

COURT: Let's go over the range of sentence that is available. Each Class 2 felony can carry prison time. The presumptive sentence is five years. The least I could give is three years. The most I could give is twelve-and-a-half years for each count. Do you understand that, Travis?

PETITIONER: Yes.

(*Id.* at 16-21.)

The court asked the defendants, including Petitioner, to confirm on the record that they entered the plea voluntarily and without any outside influences, and had the following exchange with Petitioner:

COURT: Travis, is that correct?

PETITIONER: Yes.

COURT: You are doing this of your own volition for the things that you are facing, the potential consequences of going to trial that you are facing, not because the other family member or members may receive benefit from this?

PETITIONER: That's correct.

* * *

COURT: Is there any other fact, then, other than the plea agreement itself and what you are looking at there, in terms of consequences versus going to trial and the consequences or possible outcome there, that is influencing you to any degree, Travis?

PETITIONER: No.

(*Id.* at 34-35.)

Petitioner's counsel then provided the following factual basis for the plea:

Both counts covered between January 2nd of 2002 and August 31st of 2005. Travis was selling investments that ranged, but are not limited to, a shrimp farm, resort hotel named La Contessa. There was some timber involved. And he at some point knew or should have known that Mr. Cottrell was having difficulty with the investments. And then particular victims. . . not limited to, Wanda Orr and the Rutledges alerted his office that they were not getting payments accordingly, and he continued to sell those properties, Travis did, despite knowing there [were] material problems with them.

- 7 –

And also there were payments being made. Now, those payments were coming from Mr. Cottrell's office via check to where. . . Travis Hiland was working. And they were being converted into withdrawals from the bank. The payments coming were termed loan. And Mr. Hiland had never gone over with his clients that there was going to be commissions coming out of what was paid into them.

* * *

[T]he State disclosed that something like 40-percent of the aggregate amount that went in were paid out to the Hilands, in general. About $190,000 over the period of three years was paid to Travis Hiland. He knew or should have known that the money was inappropriately going to him. That justifies the theft. He didn't alert any authorities to it, and he accepted the money. And as I said, continued to sell the property.

(*Id.* at 37-38.) Petitioner confirmed that the factual basis counsel provided was "true." (*Id.* at 38.)

The court then had the following exchange with Petitioner:

COURT: Travis do you think in connection with your own actions that you were engaged in fraudulent schemes, then, in the course of defrauding folks of their money that they weren't going to see their money as a result of these actions, once you learned about the co-defendant, Mr. Cottrell's, actions?

PETITIONER: I believed Cottrell, but there came a time where I probably should have known.

COURT: And after that you continued to invite further investment into the products?

PETITIONER: Yes.

COURT: And that resulted in some benefit to you and loss of finances by the investors?

PETITIONER: Yes.

(*Id.* at 39-40.) Petitioner then pled guilty to theft and fraudulent schemes, and the court accepted his pleas. (*Id.* at 40.)

**D.      Presentence Hearing and Sentencing**

Between January 22 and March 12, 2009, the trial court conducted a presentence hearing during which thirty-eight witnesses testified, including sixteen victims and

- 8 –

1  twenty witnesses on Petitioner's behalf.  (Doc. 15, Exs. G, NN-SS; Doc. 16, Exs. TT-

2  YY.)  Retired Detective Anna Cahall testified regarding her investigation of the case, and

3  John Fink, a financial expert from the Arizona Corporation Commission (ACC), testified

4  about his analysis of the money trail of the victims' payments into the various accounts

5  and then to the individual defendants.[5]  The State also filed numerous victim impact

6  statements, and Petitioner and his co-defendants filed numerous letters attesting to their

7  good character.  (Doc. 15, Exs. H-J.)

8  **1.   Letter from Detective Cahall**

9  For purposes of sentencing, on March 3, 2009, the State filed a letter from

10  detective Cahall.  (Doc. 15, Ex. K.)  The letter, addressed to Judge Lindberg, stated:

> There were very few times in my career that I gave my opinion to a judge regarding the sentencing of defendants, but I would like to take the opportunity in this case.  You may remember my first case involving the exploitation of an elder that you charged – the victim was Gertrude Medd, and the defendants Val Light and Jon Haywood.  At that time, such cases were unusual and we struggled with how to charge it, if at all.  Unfortunately since that time, these types of cases have become all too common, and in fact were the majority of my caseload in my last few years as a Detective.
>
> As you have heard, the current case involved a long and complex investigation and I personally interviewed close to 60 victims (many who were involved in the earlier investment schemes, where the products were misrepresented as well) . . . .  Many of the victims whose investments with the defendants were not charged kept in contact with me and during the four years of this investigation I saw many of both groups suffer the effects of their years — recurrences of cancer, strokes, heart attacks, and many deaths.  It is also clear the defendants took advantage of the ages of the victims in the excuses and lies they gave as to why the investments weren't working.
>
> I won't pretend this case hasn't affected me personally — it has, and in fact played a large role in my decision to retire early.  But more importantly, these victims — many from the Greatest Generation — a proud and trusting generation who survived the toughest of times and worked hard to save what little they had, were consciously targeted and ruthlessly taken

---

[5]   The Securities Division of the ACC also investigated the co-defendants' business activities and, on March 26, 2002, the ACC issued a cease and desist order directed to the co-defendants' business activities.  (Doc. 15, Exs. B, P.)

1
2
3
4
5

> advantage of.  To sit in court and hear the defendants try to minimize their roles even after entering pleas of guilty does more than add insult to injury.  It confirms to me that they have no remorse for what they have done.  To claim ignorance is insulting and an unconscionable excuse.  Their actions since the Corporation Commission's Cease and Desist Order further shows their lack of remorse and certainly a disregard for a court's order to create the activity and pay restitution.

6
7
8
9
10

> I hope you will make a statement, through your sentencing, that this type of blatant exploitation will not be tolerated in our County.  Although many of the victims simply asked for their money back, the likelihood of any of these defendants obtaining employment that would provide even minimal reparations to these victims is doubtful.  Please demonstrate that our system of justice works and if we can't protect our elders from exploitation, the response after will be certain and considerable.

11

(*Id.*)

12

On March 12, 2009, the date of sentencing, Petitioner and his co-defendants filed a

13

motion to disqualify Judge Lindberg based, in part, on the Cahall letter.   (Doc. 15,

14

Ex. N.)  Judge Lindberg addressed the motion at the outset of the sentencing proceeding.

15

(Doc. 16, Ex. ZZ.)  He noted that the parties knew he was a prosecutor before he became

16

a judge, and made the following statement about the letter:

17
18
19
20

> I received a copy of a notice of filing that pertained to a letter addressed to me from now-retired Detective Cahall.  I will say that, like all of the other pleadings that are filed in a case, I began to read that letter, and I will say that I thought it was inappropriate — with no offense intended — but I thought it was inappropriate to raise other cases with me as distinguished from alluding to what occurred in this case.  So, in all honesty, I put it down and didn't finish reading it.

21
22
23

> I have finished reading it now because it was attached to the motion for the Court to disqualify itself.  That notice was filed on March 2nd.  This matter proceeded to additional hearing on March 5th . . . .

24
25

> I reviewed the request.  I'll note that there was not a motion to strike the letter.  I'll note that the matter proceeded to hearing after the notice had been sent and distributed to defense counsel.

26
27

> I don't feel particularly, in the manner in which I handled it, that it provides a reason why I ought to disqualify myself, so I am declining to disqualify on the case.

28

- 10 –

(Doc. 16, Ex. ZZ at 3-4.)

Judge Lindberg, however, referred the matter to Judge Brutinel to resolve the motion for disqualification.  (*Id*. at 6-7.)  After conducting a hearing on the motion, Judge Brutinel denied it, stating:

> It appears to me that what effectively is disclosed to you is all the things that you already knew, which is that Judge Lindberg was a prosecutor.  Judge Lindberg charged cases. That Judge Lindberg was involved in a number of different cases, including as it turns out a case such as this one.
>
> I do not find that it was improper for Judge Lindberg to hear the case having been a member of the prosecutor's office.  It is not improper for him to have been the trial judge in this case having worked on a case similar to this one.  There is nothing in the canons which would mandate disqualification as a result of any of those things, and I frankly do not find anything contained in the letter or as a result of the letter which would cause Judge Lindberg to have to be.
>
> As opposed to — I don't decide whether there is misconduct on the part of the State or misconduct for that matter on the part of Detective Cahall, but I simply don't find that the letter in and of itself creates an appearance of impropriety.

(Doc. 15, Ex. O; Doc. 16, Ex. AAA at 40.)

When the sentencing proceeding resumed before Judge Lindberg, he stated that he was striking that Cahall letter and reiterated that he would not consider that letter in sentencing any of the defendants:

> I am striking the letter and the notice of filing the letter of former or now-retired Detective Cahall.
>
> My view of it is what I explained earlier this morning, which was, I thought, when one puts on a robe, I think what you need to do is to address each case that you have, each defendant that you have, in an objective and independent fashion, not losing anything that you ever knew in terms of legal experience. . . . In all things, you are trying to be neutral and objective.
>
> And the reason why I stated that I had only commenced reading the letter when it first came in was because I read everything that comes in.  But I regarded it . . . as going into, in some aspects — not all, but in some aspects, personal history as distinguished from something that was legal precedent or something that pertained to the particular case. And in later reading it, pursuant to the request to recuse, I see in many ways it is talking about this case and this case only.

But I think the color of the initial part, with due respect to ringing a bell . . . I think the judges are called upon all the time to ignore.  And I tell you that I will ignore the letter.  I am striking it . . . .

(Doc. 15, Ex ZZ at 33-34.)

### 2.    Other Presentence Motions and Sentencing

Before the sentencing proceeding, the co-defendants had also filed a motion to dismiss, a motion to disqualify the county attorney's office, and a motion to compel additional discovery pertaining to the case referenced in the Cahall letter and the State's communications with the victims, all of which the trial court denied.  (Doc. 15, Exs. L-N; O; Doc. 16, Ex. ZZ at 62.)   Petitioner and his co-defendants then moved to stay the sentencing proceeding to permit them to file a special action for review of the several motions the trial court had denied.  The trial court denied that request.[6]  (Doc. 6, Ex. ZZ at 63.)

After denying the co-defendants' motions, the trial court proceeded to sentencing. The State recommended ten-year prison sentences for Petitioner, Tyson Hiland, and Cottrell for the first count (theft), to be followed by probation on the second count (fraudulent schemes).  (*Id.* at 88.)  The State recommended probation for Joseph Hiland because his advanced age and poor health would make his incarceration very costly.  (*Id.*) In support of its sentencing recommendations, the State noted that Petitioner and his co-defendants had had the opportunity, but did not, change their business practices after the ACC ordered them to return $16 million to the investors they had misled.  (*Id.* at 70-71, 76, 83.)  The State also emphasized that many of the vulnerable victims had lost their life savings.  (*Id.* at 84-88.)

---

[6]   Petitioner appealed the trial court's denial of the motion for disqualification. The Arizona Court of Appeals, held that it lacked jurisdiction over the appeal, noting that the judgment and sentence had been entered pursuant to a plea agreement and that an order denying a motion for a change of judge was not subject to direct appeal, citing Ariz. Rev. Stat § 13-4033(B).  (Doc. 15, Ex. R.)

1    All of the co-defendants minimized their participation in the scheme.  Cottrell's

2  counsel argued that he was an unsophisticated dreamer, who did not sell the investments

3  and did not know the investors were elderly.  (*Id.* at 91- 92.)  The court sentenced Cotrell

4  to ten years' imprisonment followed by a seven-year term of probation.  (*Id.* at 91.)

5  Tyson Hiland's counsel argued that Tyson was only following in his father's footsteps.

6  (*Id.* at 151-152.)  The court sentenced Tyson Hiland to ten years' imprisonment followed

7  by seven years' probation.  (*Id.* at 163.)  Joseph Hiland's counsel emphasized that after he

8  had a stroke in 2003, he quit running the operation.  (*Id.* at 116.)  The court sentenced

9  Joseph Hiland to seven years' supervised probation "nearly exclusively on the basis of

10  [his] health condition."  (*Id.* at 122).

11    Finally, Petitioner's counsel also minimized his participation in the scheme:

12    In fact, when you go down the list of these people and heard
13    their testimony, he was really only on the periphery of most
     of this and only sold directly to a few people, and only did
14    that when somebody else wasn't available.

15    Now, that doesn't make him any less responsible for the fact
     that Wanda Orr or the Rutledges or anybody else that he dealt
16    with lost money.  That is why he pled guilty.

17    * * *

18    When I met him he was dead set [against] anything but a trial.
     The further we got into it, the further we looked at it, he said,
19    "You know what? I am guilty," and he is standing here before
     you.

20  (*Id.* at 130-31.)  Petitioner's counsel also argued that Cottrell came up with the ideas for

21  the investments and that Petitioner was only guilty of not doing his due diligence after he

22  become suspicious.  (*Id.* at 130-34.)  In imposing Petitioner's sentence, the court said in

23  part:

24    It also strikes a person in a case such as this where the dollar
     amounts are so high that a knee-jerk reaction to the evidence
25    is that kind of loss of money has changed at least the 21
     victims or couples lives in a way that is incapable of
26    realistically being altered.

27    I said the same thing before, but it is equally true in
     Mr. Travis Hiland's part of the case, about the constant worry
28

> and stress and losses that are felt by those people who lost all
> of the funds.
>
> * * *
>
> But I don't accept that Travis or Tyson or Joe didn't know
> that the money wasn't actually being invested.

(*Id.* at 140-41.)  The court noted that, although the last sale Petitioner was involved in occurred in 2004, he continued receiving money from the fraudulent scheme well after that point.  (*Id.* at 141.)

The trial court also acknowledged that Petitioner was an Eagle Scout and a missionary, and that it had received letters from many individuals attesting to Petitioner's integrity and character.   (*Id.*).   The court also considered the degree of Petitioner's culpability, stating:

> But I look at the list of victims and granting that Travis' main
> responsibility was marketing and not the direct sales like
> Tyson and others had, the marketing had a fair share of the
> fraud activities, and I will grant that the information was
> coming from Joe . . . and from Stephen Cottrell.  But I don't
> think it negates the responsibility that Travis Hiland himself
> had to do the due diligence, to follow through, to not falsify
> or misrepresent anything to these folks about the safety of
> their investment.

(*Id.* at 142.)  The court also stated that:

> The value of just what he received was over $100,000.  You
> say it is only $65,000 a year. But it's $65,000 a year that he is
> imputed with knowledge is coming from the investments.
> There isn't going to be a return on the investments, and he
> kept selling or working in the sales of it after a point where he
> knew there wasn't going to be a sufficient outcome.

(*Id.* at 143.)  The trial court further explained that it did not consider the ACC decision as an aggravating factor, but considered it as "background information" about what Petitioner should have known about how an investment company should be run, and stated that the ACC decision undermined Petitioner's claims that he relied on the word of his co-defendants.  (*Id.* at 144.)

- 14 –

Finally, the trial court found the following aggravating factors:

> I think the value of the property taken, even the value of just what Travis himself received, would be an aggravating factor. Ignoring the 1.6 million total, but just what he received out of it. The others that were involved that meet the definition of an accomplice, the receipt of the pecuniary value, I think those are all legitimate aggravating factors. The emotional and financial harm caused to the people that invested, even if you only include the ones that Travis himself dealt with, and even if you only include the ones that Travis dealt with that were over 65. All of those are substantial aggravating factors that the Court finds. And I find that the aggravating factors preponderate.

(*Id*. at 144-45.)

The court also noted that, despite the prosecutor's argument that all the defendants were similar he had "some regard for Travis being a bit distinct from the others, but not in a substantial way." (*Id.*) The court sentenced Petitioner to nine years' imprisonment followed by seven years' supervised probation. (*Id.*) The court also ordered the restitution of $1,663,849.71 to be paid jointly and severally by the co-defendants. (*Id.*)

## E.    Post-Conviction Proceeding

On January 10, 2011, Petitioner filed a petition for post-conviction relief in the trial court pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.[7] (Doc. 15, Ex. X.) Petitioner claimed that the trial court's bias and prejudice, and the prosecution's misconduct, violated his rights under the federal Due Process Clause. (*Id.*) Petitioner's co-defendants, Tyson Hiland and Cottrell, also filed individual petitions for post-conviction relief raising numerous claims. (Doc. 15, Exs. CC, DD.) As discussed below, the trial court issued a joint ruling addressing the claims that applied to all defendants and

---

[7] Petitioner and his codefendants also requested a change of judge for the post-conviction proceeding and asked the court to order the preparation of transcripts of the settlement conferences and aggravation/mitigation hearings, the trial court denied these requests. Petitioner and his codefendants filed a special action challenging these rulings. The Arizona Court of Appeals granted relief on Petitioner's request for transcripts because he and his codefendants were indigent, but denied relief on the request for a change of judge. (Doc. 15, Exhibits T-W.)

1   a separate supplemental ruling addressing Petitioner's specific claims.  (Doc. 15, Ex. AA,

2   BB.)

### 1.    Joint Ruling on Claims Affecting all Defendants

4        The post-conviction court noted that the co-defendants raised several of the same

5   claims, specifically: (1) whether the trial court was biased by the Cahall letter and the

6   presentation of evidence during the presentence hearing; (2) whether the plea

7   negotiations complied with *Solano*, 724 P.2d 17; (3) whether the court properly imposed

8   consecutive sentences, properly considered pecuniary gain as an aggravating factor,

9   properly considered mitigating factors, and whether there was improper sentencing

10  disparity; and (4) whether the defendants entered the plea agreement free of duress and

11  with a full understanding of their sentencing exposure.  (Doc. 15, Ex. AA at 2.)  The post-

12  conviction court denied relief on these claims.

### a.    Presentence Hearing

14       The court rejected the claim that the trial court was biased based on events related

15  to the presentence hearing.  (*Id.* at 2-3.)  Specifically, the court found "no basis in the

16  record to find that Judge Lindberg was biased due to the 'Cahall letter.'"  (*Id*. at 2.)  The

17  court also concluded that Judge Lindberg was not biased by the prosecutor's arguments at

18  the pre-sentence hearing.  The post-conviction court also found that evidence of the ACC

19  ruling did not bias the trial court because it considered the ACC evidence only as

20  background information.  (*Id.*)  The post-conviction court also concluded that the trial

21  court had "clearly considered all the mitigating and aggravating factors and specifically

22  applied them to each of the defendants."  (*Id.* at 2-3.)  The post-conviction court found no

23  evidence that the prosecution had manipulated the witnesses and victims who testified at

24  the presentence hearing.  (*Id.*)  In summary, the post-conviction court found "nothing in

25  the record to support the allegations that the State acted inappropriately."  (*Id.*)

### b.    Plea Negotiations and Voluntariness of Guilty Pleas

27       The post-conviction court next found that the plea negotiations did not violate the

28  standards articulated in *Solano*, 724 P.2d 17, and that the guilty pleas were voluntary in

1    compliance with the Due Process Clause.  The court explained that *Solano* requires the

2    trial court to scrutinize any "package deal" to ensure the plea is not induced by a favor

3    offered to one of the co-defendants.  (Doc. 15, Ex. AA at 3-4.)  However, the court noted

4    that the trial court is not required to make specific findings as to each factor articulated in

5    *Solano*.  (*Id.*)  The court then discussed the Rule 17.4 conferences that led to the plea

6    agreement and noted that the "State was careful to emphasize that the possible

7    recommendation of probation for Joseph Hiland was not made to induce the remainder of

8    the defendants to plead guilty," but was based Joseph Hiland's poor health.  (*Id.*)  The

9    court also noted that the range of possible penalties under the plea agreement was

10   discussed in detail with all of the defendants and their attorneys.  (*Id.* at 3.)

11   The post-conviction court also discussed the trial court's detailed inquiry to ensure

12   that each defendant entered the plea deal voluntarily and not to benefit another defendant.

13   (*Id.* at 4-7.)  The post-conviction court found that:

14            [T]he plea offers in the instant case were not entered into
              contrary to law as there was no leniency promised to any
15            Defendant if another Defendant entered into the plea, only an
              acknowledgement of the possible mitigating factors for the
16            State to consider regarding Joseph Hiland.  Each of the plea
              agreements were probation eligible.  This is not a case where
17            only Joseph Hiland's plea agreement was probation eligible.

18   (*Id.* at 7.)

19   The post-conviction court also found that there was a factual basis for the pleas.

20   (*Id.* at 8.)  The court further found that, "[e]ven assuming that there was some

21   psychological pressure placed on [Petitioner] and Tyson Hiland regarding the possibility

22   of their father's sentence," that pressure did not make the plea involuntary, especially

23   considering the trial court's efforts to ensure the voluntariness of the pleas.  (*Id.*)  The

24   court concluded that "[t]here are no other relevant factors that impermissibly influenced

25   Tyson or Travis's plea.  The transcript is clear.  Judge Lindberg labored to ensure that

26   both Defendants were entering into the plea agreements of their own volition and not

27   because of any outside promises or coercion."  (*Id.*)

28

The post-conviction court further found that the defendants entered the plea agreements voluntarily and with full understanding of their sentencing exposure. (*Id.* at 11-12.) The court noted that, during the plea negotiations, while the State agreed that probation was possible, the State refused to indicate the particular sentences it would recommend for Petitioner, Tyson Hiland, and Cottrell. (*Id.* at 11.) Additionally, the full range of sentencing was discussed with all of the defendants during the Rule 17.4 conferences. (*Id.*) The post-conviction court also noted that at the change-of-plea hearing, Petitioner and his codefendants affirmed several times that they entered their pleas voluntarily and that they were not based on any promise or agreement with the State that was not memorialized in the plea agreement. (*Id.*)

The post-conviction court also noted that the plea agreements did not contain any guarantees as to the State's sentencing recommendations and accurately stated the sentencing ranges. (*Id.* at 11-12.) The post-conviction court concluded that "Tyson and Travis Hiland and Steven Cottrell were fully advised as to the range of possible sentencing and that all three Defendants indicated that they understood the range of sentencing and answered several times that they were not entering into the plea agreement under any type of duress or coercion." (*Id.* at 12.)

### c.   Consecutive Sentences

The post-conviction court next concluded that the consecutive sentences did not violate the prohibition against double punishment. (Doc. 15, Ex. Aa at 8.) The court conducted the analysis required under *State v. Gordon*, 778 P.2d 1204 (Ariz. 1989), to determine whether the crimes constituted one act or multiple acts that could be punished separately. (*Id.* at 9.) The court concluded that "the act of the fraud scheme is separate from the act of the actual taking of the funds for their own use." (*Id.*) The court explained that the defendants knowingly obtained a benefit by misrepresenting that they had actual investment opportunities for the victims and that they would benefit from the investments. (*Id.*) The Defendants then received money from the victims and kept the money for their own gain. (*Id.*) Because fraud and theft were separate acts, the court

1    held that "[c]onsecutive sentencing under *Gordon* is not contrary to law in this case."

2    (*Id.*)

3          The post-conviction court next found that the trial court did not err by considering

4    pecuniary gain as an aggravating circumstance.  (*Id.* at 10.)  The court noted that pursuant

5    to *State v. Germain*, 723 P.2d 105, 108 (Ariz. 1986), if the state legislature has

6    specifically identified an aggravating factor in Ariz. Rev. Stat. § 13-702, it may be used

7    to enhance a sentence, even if it is an element of the charged offense.  Because § 13-702

8    specifically identified pecuniary gain as an aggravating factor, the court concluded that

9    the trial court properly considered pecuniary gain an aggravating factor.  (*Id.* at 9-10.)

10          The post-conviction court next found that the trial court properly considered the

11   mitigating factors for each defendant and there was no improper sentencing disparity.

12   (*Id.* at 10-11.)   The court noted that, at sentencing, each defendant and his counsel

13   addressed the court and the trial court reviewed each defendant's particular role in the

14   events "even to the point of naming the particular victims that each of them had contact

15   with and that victim's personal situation." (*Id.* at 10.)  The court also noted that the trial

16   court had reviewed numerous letters written on behalf of the individual defendants.  (*Id.*)

17          The post-conviction court also discussed the aggravating and mitigating

18   circumstances the trial court considered for each defendant.  (*Id.* at 10-11.)  The post-

19   conviction court noted the trial court's conclusion that although Petitioner differed from

20   other defendants, it was not in a substantial way.  (*Id.* at 11.)  The post-conviction court

21   stated that "[t]he record shows that Judge Lindberg went to great lengths to avail himself

22   of the aggravating and mitigating circumstances in each individual case.  There is nothing

23   in the record that shows that Judge Lindberg failed to consider mitigating factors in this

24   case.  Aggravated sentences were not improper under law in this case and any disparity in

25   sentencing was considered and explained on the record." (*Id.* at 11.)

26                 **2.     The Supplemental Ruling on Petitioner's Claims**

27          In the supplemental ruling on Petitioner's specific claims, the post-conviction

28   court found that Petitioner "entered into a plea agreement of his own accord and

- 19 –

1  repeatedly asserted that he understood both the voluntary nature of that plea and the range

2  of sentencing."  (Doc. 15, Ex. BB at 2.)  The court further found that "there is no

3  evidence in the record that reflects that Judge Lindberg was biased, that the presentation

4  was impermissibly distorted by the prosecution or that the prosecution was favored by the

5  Court during the presentence hearing."  (*Id.*)  The court also noted that it had reviewed

6  the entire file and record in the case and found no basis to grant relief under Rule 32. (*Id.*)

7  **3.    Petitions for Review by Higher State Courts**

8  Petitioner filed a petition for review of the trial court's denial of his petition for

9  post-conviction relief in the Arizona Court of Appeals.  (Doc. 15, Exs. EE-GG.)  On

10  August 14, 2012, the appellate court granted review, but denied relief, adopting the trial

11  court's rulings.  (Doc. 15, Ex. HH.)  Petitioner filed a petition for review in the Arizona

12  Supreme Court, which the court denied on December 12, 2012.  (Doc. 15, Ex. II.)

13  **F.    Federal Petition for Writ of Habeas Corpus**

14  On May 6, 2013, Petitioner filed the pending habeas Petition raising the following

15  grounds for relief: (1) his guilty plea was not knowing, intelligent and voluntary because

16  it was part of a coerced package deal in violation of the Fourteenth Amendment (Ground

17  One); (2) his guilty plea was the result of ineffective assistance of counsel in violation of

18  the Sixth Amendment (Ground Two); (3) the State engaged in prosecutorial misconduct

19  in violation the Fifth, Sixth, and Fourteenth Amendments (Ground Three); (4) he did not

20  receive fair hearings or a fair sentence because the trial court was biased and prejudiced

21  against him in violation of the Sixth and Fourteenth Amendments (Ground Four); (5) his

22  consecutive sentences violated the double punishment clause of the Fifth Amendment

23  (Ground Five); and  (6) the trial court improperly considered aggravating and mitigating

24  factors in violation of the Fifth, Sixth, and Fourteenth Amendments (Ground Six).

25  (Doc. 1.)

26  Petitioner requests an evidentiary hearing, and that the Court set aside his guilty

27  plea or remand this matter to the state court for resentencing.  (*Id.* at 13.)  Respondents

28

1    argue that Petitioner's claims asserted in Ground Two are procedurally barred from

2    federal habeas corpus review and that his remaining claims lack merit.

3    **II.    Exhaustion and Procedural Bar**

4          Ordinarily, a federal court may not grant a petition for writ of habeas corpus

5    unless the petitioner has exhausted available state remedies.  28 U.S.C. § 2254(b).  To

6    exhaust state remedies, a petitioner must afford the state courts the opportunity to rule

7    upon the merits of his federal claims by "fairly presenting" them to the state's "highest"

8    court in a procedurally appropriate manner.[8]  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)

9    ("[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly

10   present' his claim in each appropriate state court  .  .  .  thereby alerting that court to the

11   federal nature of the claim"); *Castille v. Peoples*, 489 U.S. 346, 349 (1989) (same).  "A

12   claim has been 'fairly presented' if the petitioner has described both the operative facts

13   and the federal legal theory on which his claim is based."  *Baldwin*, 541 U.S. at 33.  A

14   "state prisoner does not 'fairly present' a claim to a state court if that court must read

15   beyond a petition or brief . . . that does not alert it to the presence of a federal claim in

16   order to find material, such as a lower court opinion in the case, that does so."  *Id.* at 31-

17   32.  Thus, "a petitioner fairly and fully presents a claim to the state court for purposes of

18   satisfying the exhaustion requirement if he presents the claim: (1) to the proper

19   forum, . . (2) through the proper vehicle, . . . and (3) by providing the proper factual and

20   legal basis for the claim."  *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005)

21   (internal citations omitted).

22         The requirement that a petitioner exhaust available state court remedies promotes

23   comity by ensuring that the state courts have the first opportunity to address alleged

24   violations of a state prisoner's federal rights.  *See Duncan v. Walker*, 533 U.S. 167, 178

25   (2001); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).  Principles of comity also

26   _____

27         [8]   In Arizona, unless a prisoner has been sentenced to death, the highest court
     requirement is satisfied if the petitioner has presented his federal claim to the Arizona
28   Court of Appeals either on direct appeal or on post-conviction relief.  *Castillo v.*
     *McFadden*, 399 F.3d 993, 998 n.3 (9th Cir. 2005).

1   require federal courts to respect state procedural bars to review of a habeas petitioner's

2   claims.  *See Coleman*, 501 at 731-32.  Pursuant to these principles, a habeas petitioner's

3   claims may be precluded from federal review in two situations.

4   First, a claim may be procedurally defaulted and barred from federal habeas

5   corpus review when a petitioner failed to present his federal claims to the state court, but

6   returning to state court would be "futile" because the state court's procedural rules, such

7   as waiver or preclusion, would bar consideration of the previously unraised claims.  *See*

8   *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Beaty v. Stewart*, 303 F.3d 975, 987 (9th

9   Cir. 2002).  If no state remedies are currently available, a claim is technically exhausted,

10  but procedurally defaulted.  *Coleman*, 501 U.S. at 732, 735 n.1.

11  Second, a claim may be procedurally barred when a petitioner raised a claim in

12  state court, but the state court found the claim barred on state procedural grounds.  *See*

13  *Beard v. Kindler*, 558 U.S. 53 (2009).  "[A] habeas petitioner who has failed to meet the

14  State's procedural requirements for presenting his federal claim has deprived the state

15  courts of an opportunity to address those claims in the first instance."  *Coleman*, 501 U.S.

16  at 731-32.  In this situation, federal habeas corpus review is precluded if the state court

17  opinion relies "on a state-law ground that is both 'independent' of the merits of the

18  federal claim and an 'adequate' basis for the court's decision."  *Harris v. Reed*, 489 U.S.

19  255, 260 (1989).  A state procedural ruling is "independent" if the application of the bar

20  does not depend on an antecedent ruling on the merits of the federal claim.  *See Stewart*

21  *v. Smith*, 536 U.S. 856, 860 (2002); *Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985).  A state

22  court's application of the procedural bar is "adequate" if it is "strictly or regularly

23  followed."  *See Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994).  If the state court

24  occasionally excuses non-compliance with a procedural rule, that does not render its

25  procedural bar inadequate.  *See Dugger v. Adams*, 489 U.S. 401, 410-12 n.6 (1989).

26  "The independent and adequate state ground doctrine ensures that the States' interest in

27  correcting their own mistakes is respected in all federal habeas cases."  *Coleman*, 501

28  U.S. at 732.  Although a procedurally barred claim has been exhausted, as a matter of

1    comity, the federal court will decline to consider the merits of that claim.  *See id.* at 729-

2    32.

3         However, because the doctrine of procedural default is based on comity, not

4    jurisdiction, federal courts retain the power to consider the merits of procedurally

5    defaulted claims.  *See Reed v. Ross*, 468 U.S. 1, 9 (1984).  Generally, a federal court will

6    not review the merits of a procedurally defaulted claim unless a petitioner demonstrates

7    "cause" for the failure to properly exhaust the claim in state court and "prejudice" from

8    the alleged constitutional violation, or shows that a "fundamental miscarriage of justice"

9    would result if the claim were not heard on the merits.  *Coleman*, 501 U.S. at 750.

10   Additionally, pursuant to 28 U.S.C. § 2254(b)(2), the court may dismiss plainly meritless

11   claims regardless of whether the claim was properly exhausted in state court.  *See Rhines*

12   *v. Weber*, 544 U.S. 269, 277 (2005) (holding that a stay is inappropriate in federal court

13   to allow claims to be raised in state court if they are subject to dismissal under

14   § 2254(b)(2) as "plainly meritless").

15        **A.    Federal Habeas Review of Ground Two is Procedurally Barred**

16        In Ground Two, Petitioner argues that his "guilty plea was the product of

17   ineffective assistance of counsel," and cites several instances of the alleged

18   ineffectiveness.  (Doc. 1 at 15.)  Petitioner did not present these claims of ineffective

19   assistance to the state court in his petition for post-conviction review, and the state court

20   did not address these claims in the joint order that applied to Petitioner and his co-

21   defendants.  (Doc. 15, Exs. X, AA.)  Thus, Petitioner did not exhaust available state

22   remedies for his claims in Ground Two.

23        It would be futile for Petitioner to return to the state court to exhaust his claims

24   asserted in Ground Two because a successive petition for post-conviction relief would be

25   untimely, and the claims would be precluded from Rule 32 review because they could

26   have been raised in Petitioner's prior post-conviction proceeding.  *See* Ariz. R. Crim. P.

27   32.2(a)(3) and 32.4(a); *see also See State v. Shrum*, 203 P.3d 1175, 1178 (Ariz. 2009)

28   (stating that "[r]ule 32.2(a) precludes collateral relief on a ground that either was or could

- 23 –

1    have been raised on direct appeal or in a previous PCR proceeding."); *State v. Bennett*,

2    146 P.3d 63, 67 (2006) ("As a general rule, when [claims] are raised, or could have been

3    raised, in a Rule 32 post-conviction proceeding, subsequent claims [] will be deemed

4    waived and precluded.") (internal quotation omitted).

5         Because Petitioner cannot return to state court to exhaust the claims asserted in

6    Ground Two, they are technically exhausted and barred from federal habeas corpus

7    review.  *See Teague*, 489 U.S. at 297-99 (claim was procedurally defaulted where it was

8    "clear that collateral relief would be unavailable to [the] petitioner" if he returned to the

9    state courts); *McKinney v. Ryan*, 730 F.3d 903, 914 (9th Cir. 2013) (Arizona prisoner's

10   unexhausted claim was procedurally barred because he would be barred from raising it in

11   state court pursuant to Rules 32.2(a) and 32.4).   Accordingly, the claims asserted in

12   Ground Two are procedurally defaulted, and are not subject to federal habeas corpus

13   review unless Petitioner establishes a "fundamental miscarriage of justice" or "cause and

14   prejudice" to overcome the procedural bar.  *See Coleman*, 501 U.S. at 749-50; *Teague*,

15   489 U.S. at 297-98.  As discussed in Sections II.B and II.C, Petitioner has not established

16   either basis to excuse the procedural default of Ground Two.

17   **B.      Fundamental Miscarriage of Justice**

18        A federal court may review the merits of a procedurally defaulted claim if the

19   petitioner demonstrates that failure to consider the merits of that claim will result in a

20   "fundamental miscarriage of justice."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  A

21   "fundamental miscarriage of justice" occurs when "'a constitutional violation has

22   probably resulted in the conviction of one who is actually innocent.'"  *Id.* (citing *Murray

23   v. Carrier*, 477 U.S. 478, 496 (1986)).

24        To establish a fundamental miscarriage of justice, a petitioner must present "new

25   reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness

26   accounts, or critical physical evidence — that was not presented at trial."  *Schlup*, 513

27   U.S. at 324.  The petitioner has the burden of demonstrating that "it is more likely than

28   not that no reasonable juror would have convicted him in light of the new evidence."  *Id.*

at 327.  Petitioner does not argue, and the record does not indicate, that failure to consider Petitioner's defaulted claims will result in a fundamental miscarriage of justice. Accordingly, this exception does not excuse the procedural bar.

### C.      Cause and Prejudice

A federal court may review the merits of a procedurally defaulted claim if a petitioner establishes "cause" and "prejudice." *Coleman*, 501 U.S. at 750.  To establish "cause," a petitioner must establish that some objective factor external to the defense impeded his efforts to comply with the state's procedural rules. *Teague*, 489 U.S. at 298. A showing of "interference by officials," constitutionally ineffective assistance of counsel, or "that the factual or legal basis for a claim was not reasonably available" may constitute cause. *Murray*, 477 U.S. at 488.

"Prejudice" is actual harm resulting from the constitutional violation or error. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984).  To establish prejudice, a habeas petitioner bears the burden of demonstrating that the alleged constitutional violation "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original); *see Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991). If a petitioner fails to establish cause for his procedural default, then the court need not consider whether the petitioner has shown actual prejudice resulting from the alleged constitutional violations.  *Smith v. Murray*, 477 U.S. 527, 533 (1986).

### 1.      Lack of Legal Representation and Legal Knowledge

To the extent that Petitioner argues "cause" based on his pro se status and lack of legal knowledge, including his lack of knowledge of the Arizona Rules of Criminal and Appellate Procedure, his arguments are unavailing.   A petitioner's lack of legal knowledge, status as an inmate, and limited legal resources do not constitute cause to excuse the procedural bar. *See Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988) (petitioner's arguments concerning his mental health and reliance upon jailhouse lawyers did not constitute cause); *Hughes v. Idaho State Bd. of Corrs.*, 800 F.2d 905, 909 (9th

1    Cir. 1986) (an illiterate pro se petitioner's lack of legal assistance was not cause to excuse

2    a procedural default).

3                    **2.      Ineffective Assistance of Post-Conviction Counsel**

4            To establish "cause" to overcome the procedural bar to habeas corpus review of

5    his claims, Petitioner argues that he was denied the effective assistance of counsel on

6    post-conviction review.  (Doc. 1 at 16; Doc. 25 at 8-12.)  Generally, any errors of counsel

7    during the post-conviction proceedings cannot serve as a basis for cause to excuse a

8    petitioner's procedural default of other claims.  *See Coleman*, 501 U.S. at 752.  However,

9    in *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1315 (2012), the Supreme Court

10   established a limited exception to this general rule.  The Court held that the ineffective

11   assistance of post-conviction counsel "at initial-review collateral review proceedings" —

12   while not stating a constitutional claim itself — may establish cause to excuse procedural

13   default of claims of  ineffective assistance of trial counsel when a post-conviction

14   proceeding represents the first opportunity under state law for a petitioner to litigate such

15   claims.  *Id.* at 1315. "Cause" is established under *Martinez* when:

16               (1) the claim of "ineffective assistance of trial counsel" was a
                 "substantial" claim; (2) the "cause" consisted of there being
17               "no counsel" or only "ineffective" counsel during the state
                 collateral review proceeding; (3) the state collateral review
18               proceeding was the "initial" review proceeding in respect to
                 the   "ineffective-assistance-of-trial-counsel   claim";   and
19               (4) state law requires that an "ineffective assistance of trial
                 counsel [claim] . . . be raised in an initial-review collateral
20               review proceeding.

21   *Trevino v. Thaler*, __ U.S.__, 133 S. Ct. 1911, 1918 (2013) (citing *Martinez*, 132 S. Ct. at

22   1318-19, 1320-21). [9]  In *Nguyen v. Curry*, 736 F.3d 1287, 1296 (9th Cir. 2013), the Ninth

23   Circuit held that "the *Martinez* standard for cause applies to all Sixth Amendment

24   ineffective-assistance claims, both to trial and appellate, that have been procedurally

25   defaulted by ineffective counsel in the initial-review state-court collateral proceeding."

26   _____

27        [9]  The third and fourth prongs of the *Martinez* test are not at issue in this case
     because an Arizona petitioner cannot bring a claim of ineffective assistance of trial or
28   appellate counsel until the "initial-review state court collateral proceeding . . . ."  *See*
     *Nguyen*, 736 F.3d at 1294-95.

1      The *Martinez* exception applies only to the ineffectiveness of post-conviction
2  counsel in the initial post-conviction review proceeding.  It "does not extend to attorney
3  errors in any proceeding beyond the first occasion the State allows a prisoner to raise a
4  claim of ineffective assistance at trial." *Id.* at 1320.  Rather, *Martinez* is concerned that,
5  if ineffective assistance of counsel claims were not brought in the collateral proceeding
6  that provided the first occasion to raise such claims, then the claims could not be brought
7  at all.  *Id.* at 1316.  Therefore, a petitioner may not assert "cause" to overcome the
8  procedural bar based on attorney error that occurred in "appeals from initial-review
9  collateral proceedings, second or successive collateral proceedings, and petitions for
10  discretionary review in a State's appellate courts." *Id.* at 1320.

11      To establish cause under *Martinez*, a petitioner must demonstrate that post-
12  conviction counsel's failure to raise the defaulted claim was itself ineffective under the
13  standards of *Strickland v. Washington*, 466 U.S. 668 (1984), and that the underlying
14  claim of ineffective assistance of counsel was "substantial." *Martinez*, 132 S. Ct. at
15  1318. A "substantial" claim "has some merit." *Id.*  Like the standard for issuing a
16  certificate of appealability, to establish a "substantial" claim, a petitioner must
17  demonstrate that "reasonable jurists could debate whether . . . the petition should have
18  been resolved in a different manner or that the issues presented were adequate to deserve
19  encouragement to proceed further." *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir.
20  2013) (internal quotations omitted).  In other words, a claim is "'insubstantial' if it does
21  not have any merit or is wholly without factual support." *Id.*  Determining whether an
22  ineffective assistance of counsel claim is substantial requires a district court to examine
23  the claim under the standards of *Strickland*.

24              **a.      Establishing an Ineffective Assistance of Counsel Claim**

25      To establish a Sixth Amendment claim of ineffective counsel, a petitioner must
26  show that counsel's performance was objectively deficient and that counsel's deficient
27  performance prejudiced the petitioner.  *Id.* at 687.  To be deficient, counsel's
28  performance must fall "outside the wide range of professionally competent assistance."

*Id.* at 690.   When reviewing counsel's performance, the court engages a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment.  *Id.*  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.   Review of counsel's performance is extremely limited.  Acts or omissions that "might be considered sound trial strategy" do not constitute ineffective assistance of counsel.  *Id.* at 689.

To establish a Sixth Amendment violation, a petitioner must also establish that he suffered prejudice as a result of counsel's deficient performance.  *Id.* at 691-92.  To show prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  The court need not address both *Strickland* requirements if the petitioner makes an insufficient showing on one.  *See id.* at 697 (explaining that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) (stating that "[f]ailure to satisfy either prong of the *Strickland* test obviates the need to consider the other") (citing S*trickland*, 466 U.S. at 688).

### b.        Petitioner's Ineffective Assistance Claim

Petitioner claims that post-conviction counsel was ineffective for failing to raise on post-conviction review the claims of ineffective assistance of trial counsel that Petitioner asserts in Ground Two of his Petition.  (Doc. 1 at 7, 15.)  In Ground Two, Petitioner argues that his guilty plea "was the product of ineffective assistance of counsel."[10]  (Doc. 1 at 7.)

---

[10]  In his Reply, Petitioner raises additional claims of ineffective assistance of trial counsel that he did not raise in his Petition and that he never presented to the state courts. Specifically, Petitioner argues that trial counsel was ineffective for (1) failing to challenge the charging document (Doc. 25 at 17, 18-19, 26), (2) failing to retain experts (*Id.* at 17, 22, 24 ); (3) failing to conduct a pretrial investigation (*Id.* at 17, 22-23, 26); (4) presuming that the state court "made the showing of the mens rea to deprive the

The negotiation of a plea bargain is "'a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.'"  *Missouri v. Frye*, ___ U.S. ___, 132 S. Ct. 1399, 1406 (2012) (quoting *Padilla v. Kentucky*, 559 U.S. ___ 356, ___, (2010)).  If counsel has misadvised a defendant about the law during a plea negotiation, or improperly coerced a defendant to accept a plea bargain, counsel's performance may be found deficient.  *See Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012) (counsel's erroneous legal advice about possibility of conviction that led to rejection of plea offer constituted deficient performance).  "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."  *Id.* at 1387.  To satisfy *Strickland's* prejudice prong when a petitioner has pleaded guilty, he must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (citations omitted).

To support his claim that he received ineffective assistance during his plea negotiations, Petitioner argues that trial counsel "was anxious for [him] to enter into the package plea deal."  (Doc. 1 at 15.)  Petitioner asserts that counsel told him "he would not win at trial because a jury would be prejudiced by the emotional dynamics of the case, but that [his counsel] was able to specifically negotiate probation eligibility for Petitioner

victims of their property (*Id.* at 17-18); (5) failing to move for severance (Doc. 25 at 20-22); (6) failing to provide Petitioner with discovery, including investigative reports and witness statements,(7) failing to advise Petitioner that he was presumed innocent and that his guilt had to be established beyond a reasonable doubt (*Id.* at 28); (8) permitting Petitioner to enter a coercive package plea (*Id.* at 28); (9) failing to challenge the presentence report (*Id.* at 31); and (10) broadening the scope of the charging document by allocuting that Petitioner converted funds (*Id.* at 31).  He also argues that the cumulative effect of counsel's errors was prejudicial.  (Doc. 25 at 17.)

For the reasons set forth in Section II.A, these claims are technically exhausted and procedurally barred.  Additionally, because Petitioner did not present any of these claims of ineffective assistance of counsel in his Petition (Doc. 1), the Court will not consider them in determining whether the ineffective assistance of post-conviction counsel constitutes cause to excuse the procedural bar.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003) (stating that "[t]he district court need not consider arguments raised for the first time in a reply brief.").

1    because Judge Lindberg understood that Petitioner was in a different class as the other

2    defendants as far as culpability was concerned." (*Id.*)

3        Petitioner claims that he objected to the terms of the plea agreement because they

4    "potentially subjected him to serving a lengthy prison sentence," but asserts that counsel

5    told him "this was just a technicality, and that the reason the terms of the plea included

6    the possibility of prison was that it was based on a package deal and it had to include

7    provisions that applied to the other defendants." (*Id.*)  Petitioner alleges that trial counsel

8    told him that he "would not be treated [as] harshly under the plea as the other defendants

9    would be, and it was on this basis that Petitioner entered into the agreement." (*Id.* at 15-

10   16.)  Petitioner asserts that "had [he] been aware that there was no such understanding

11   with Judge Lindberg, and moreover, that he could not have [] fared worse at trial, he

12   never would have entered into the plea agreement." (*Id.* at 16.)

13                  **i.      Trial Counsel's Assessment of the Case**

14       A central part of an attorney's job is "to assimilate and synthesize information

15   from numerous sources and then advise clients about what is perceived to be in their best

16   interests." *Fields v. Gibson*, 277 F.3d 1203, 1214 (10th Cir. 2002).  Counsel's "negative

17   assessment of the chances of prevailing at trial does not invalidate a subsequent guilty

18   plea." *Johnson v. Woodford*, 2010 WL 5313310, at *9 (C.D. Cal. Nov. 1, 2010).  Trial

19   counsel was not deficient for telling Petitioner that he did not think he would not win at

20   trial because of the facts of the case and because the jury would be sympathetic to the

21   elderly victims who lost significant amounts of money.  *See Fields*, 277 F.3d at 1214

22   (affirming denial of habeas corpus relief on ineffective assistance of trial counsel claim

23   because "[a]dvice — even strong urging by counsel does not invalidate a guilty plea"

24   (internal quotations marks and citation omitted)); *see also United States v. Crank*, 438

25   F.2d 635, 637 (9th Cir.1971) (finding no coercion when counsel "frankly stated to the

26   appellant that he did not have 'a leg to stand on' and should enter a plea of guilty");

27   *Johnson*, 2010 WL 5313310, at *9 ("The mere fact that counsel may have advised

28

petitioner that he should accept the plea offer because a more favorable outcome at trial was unlikely does not show counsel gave ineffective advice or coerced the plea.").

### ii.      Ability to Negotiate Probation-Eligible Plea

Additionally, trial counsel was not deficient for telling Petitioner that he could negotiate a probation eligible plea because the record reflects that he was able to negotiate such a plea offer. As discussed in Section I.B, the record reflects that the State made a plea offer that included the possibility of probation. (Doc. 15, Ex. KK at 12-13.) During the plea negotiations, Judge Brutinel told Petitioner that he did not think the State would agree to a "probation mandatory" plea agreement, and that he was surprised the State was willing to make a probation eligible offer. (Doc. 15, Ex. LL at 19-20.) Based on the record, counsel was not deficient for advising Petitioner that he could negotiate a probation eligible plea offer.

### iii.      Plaintiff's Culpability

Further, it was not deficient performance for trial counsel to tell Petitioner that Judge Lindberg understood that Petitioner was less culpable than the other defendants. As discussed in Section I.D, the record reflects that Judge Lindberg considered Plaintiff less culpable than his codefendants (Doc. 15, Ex. ZZ at 145), and he sentenced Petitioner to nine years' imprisonment on the theft count, which was one year less than the ten-year prison sentences he imposed on co-defendants Cotrell and Tyson Hiland. (*Id.* at 105, 145, 163.)

### iv.      Promise that Plaintiff would not be Treated Harshly

Petitioner further argues that he told trial counsel that he opposed the potentially lengthy prison sentence included in the plea agreement. (Doc. 1 at 15.) He alleges that trial counsel told him that the plea agreement included the possibility of a longer prison sentence as a "technicality" because the package plea agreement included provisions that applied to Petitioner and to other defendants. (*Id.*) Petitioner asserts that trial counsel told Petitioner he "would not be treated[as] harshly under the plea as the other defendants

- 31 –

1   would be, and it was on this basis that Petitioner entered into the agreement." (*Id.* at 15-

2   16.)  Petitioner further states that had he known that he "could not have fared worse at

3   trial, he never would have never would have entered into the plea agreement." (*Id.* at 16.)

4   The record, however, does not support Petitioner's claims, which are supported

5   only by his self-serving statements.  As discussed in Section I.B, the record reflects that,

6   during the Rule 17.4 plea negotiations, Petitioner was fully advised of the range of

7   potential sentences.  (Doc. 15, Exs. KK, LL at 14, 19-20.)  Judge Brutinel stressed, in

8   Petitioner's presence, that he did not think the State would make a specific sentencing

9   recommendation at trial.  (Doc. 15, Ex. LL at 14.)  He also advised Petitioner that, if he

10  accepted the State's plea offer, he faced a sentencing range of three to twelve-and-one-

11  half years' imprisonment with the possibility of probation.  (*Id.*)  He emphasized that the

12  trial court would likely sentence Petitioner to prison for between "five to 12-and-a-half

13  years," based on the number of "vulnerable adults" who were victims.  (*Id.* at 19-20.)

14  The plea agreement also included the range of sentencing and provided that

15  Petitioner would plead guilty to one count of theft (Count One) and one count of

16  fraudulent schemes (Count Two), both class two felonies.  (Doc. 15, Ex. F at 1.)  The

17  plea agreement further provided that each class two felony "carrie[d] a presumptive

18  sentence of 5 years, a minimum sentence of 4 years (3 years if the Court finds

19  exceptional circumstances), and a maximum of 10 years (12.5 years if the Court finds

20  exceptional circumstances.)." (*Id.*)

21  During the change of plea hearing, the trial court discussed the charges and the

22  range of sentencing in detail and Petitioner affirmed that he understood his sentencing

23  exposure.  (Doc. 15, Ex. MM at 61, 63.)  Specifically, the following exchange took place:

24  COURT: Let's go over the range of sentence that is available.
Each Class 2 felony can carry prison time.  The presumptive
25  sentence is five years.  The least I could give is three years.
The most I could give is twelve-and-a-half years for each
26  count.  Do you understand that Travis?

27  PETITIONER: Yes.

28  * * *

- 32 –

1          COURT:  It appears that probation that is available for each
2          [defendant] for a term not to exceed seven years.  Do you
           understand that . . . Travis?

3          PETITIONER:        Yes.

4   (Doc. 15, Ex. MM at 63.)

5          In his Petition, Petitioner claims that trial counsel indicated that he had a separate

6   agreement with Judge Lindberg pursuant to which Petitioner would be sentenced only to

7   probation.   (Doc. 1 at 15-16.)  The record, however, does not support this claim.  During

8   the change of plea hearing, the trial court specifically asked Petitioner whether any

9   agreements, other than those contained in the plea agreement, influenced his decision to

10  enter the plea agreement:

11         COURT: Has anybody made you any promises, guarantees or
12         assurances so that you would enter the plea agreement, other
           than what is contained in the plea agreement itself? Travis?

13         PETITIONER: No.

14  (*Id.* at 59.)

15         Petitioner also affirmed that he had not been threatened, forced, or coerced to enter

16  the plea agreement.  (*Id.*)  In summary, Petitioner acknowledged under oath that he faced

17  up to twelve-and-a-half years' imprisonment on each count of conviction.   He also

18  affirmed that there were no agreements outside of the plea agreement that influenced his

19  decision to accept the plea agreement.

20         Petitioner's contemporaneous statements regarding his understanding of the plea

21  agreement and his potential sentences carry substantial weight.  *See Blackledge v.*

22  *Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong

23  presumption of verity. The subsequent presentation of conclusory allegations

24  unsupported by specifics is subject to summary dismissal, as are contentions that in the

25  face of the record are wholly incredible."); *United States v. Mims*, 928 F.2d 310, 313 (9th

26  Cir. 1991) ("We attach substantial weight to contemporaneous on-the-record statements

27  in assessing the voluntariness of pleas.")  Because Petitioner stated at the time he entered

28  his guilty plea that his plea was knowing and voluntary, and that it was not based on any

promises other than those contained in the plea agreement, the record does not support his assertion that he entered his plea based on trial counsel's representation that he had some sort of a sentencing agreement with Judge Lindberg.

### v.   Conclusion

Therefore, Petitioner has not shown that trial counsel was deficient for the reasons alleged in Ground Two of the Petition. *See Timmons v. Schriro*, 2009 WL 440210, at *3 (D. Ariz. Feb. 23, 2009) (denying petitioner's claim of ineffective assistance of counsel based on counsel's alleged failure to inform him of the right to have aggravating factors found by a jury beyond a reasonable doubt because the plea agreement set forth that petitioner waived this right, and the petitioner "told the trial court that he understood the sentence he was facing and agreed to waive his right to have a jury determine aggravating factors."). Accordingly, the Court does not need to reach *Strickland's* prejudice prong. *See Strickland*, 466 U.S. at 697.

Because Petitioner has not shown that trial counsel was ineffective for the reasons alleged in Ground Two, he cannot show that post-conviction counsel was ineffective for failing to raise those claims of ineffective assistance of counsel on post-conviction review and, therefore, he has not met the *Martinez* standard. *See Wildman v. Johnson*, 261 F.3d 832, 840-42 (9th Cir. 2001) (appellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance of counsel when claim would not have provided grounds for reversal); *Miller v. Keeney*, 882 F.2d 1428, 1434-35 (9th Cir. 1989) (appellate counsel is not deficient for failing to raise a weak issue). Accordingly, Ground Two is barred from federal habeas corpus review.

### III.   Review of Petitioner's Remaining Claims

Petitioner's claims asserted in his pending habeas petition in Ground Three (prosecutorial misconduct), Ground Four (judicial bias), and Ground Six (improper consideration of aggravating and mitigating factors) were raised in Petitioner's petition for post-conviction relief and in his petition for review to the Arizona Court of Appeals. (Doc. 15, Exs. Z, EE.) Accordingly, Petitioner properly exhausted those claims and they

1    are properly before the Court on habeas corpus review.  Petitioner did not explicitly raise

2    the issues contained in Ground One (voluntariness of guilty plea) and Ground Five

3    (consecutive sentences) in his petition for post-conviction relief.  (Doc. 15, Ex. X.)

4         Respondents nonetheless assert that Petitioner's claims asserted in Grounds One,

5    Three, Four, Five, and Six are properly before the Court because they were either raised

6    in Petitioner's separate petition for post-conviction relief, or by his co-defendants, and

7    they were addressed by the post-conviction court in a joint ruling that applied to

8    Petitioner, and that was later adopted by the court of appeals.  (Doc. 15 at 34, Ex. X;

9    Doc. 15, Ex. AA.)  Therefore, Respondents assert that those claims are properly before

10   this Court on federal habeas corpus review citing *Lebron v. National R.R. Passenger*

11   *Corp*., 513 U.S. 374 (1995) (quoting *United States v. Williams*, 504 U.S. 36, 41 (1992)

12   ("Our practice 'permit[s] review of an issue not pressed so long as it has been passed

13   upon' . . . .")).

14        In its joint ruling on the co-defendants' petitions for post-conviction relief, the

15   post-conviction court identified four "shared" issues that it considered raised in the

16   separate petitions filed by Tyson and Travis Hiland.  (Doc. 15, Ex. AA at 1-2.)  Those

17   shared issues were: (1) judicial bias, (2) whether the package plea deal was coercive

18   under state law, (3) whether the court erred in imposing consecutive sentences,

19   considering pecuniary gain an aggravating factor, and whether the court properly

20   considered aggravating and mitigating factors and sentencing disparity, and (4) whether

21   the guilty pleas were voluntarily entered.  (Doc. AA at 1-2.)  It appears that the state court

22   liberally construed Petitioner's petition as including all four of the shared issues

23   (*compare* Doc. 15, Ex. X, *with* Doc. 15, Ex. AA at 1-2), Petitioner challenged the post-

24   conviction court's joint and supplemental orders on appeal of the denial of post-

25   conviction review (Doc. 15, Ex. EE), and Respondents state that these claims are

26   properly before the Court and do not argue failure-to-exhaust or procedural default as to

27

28

Grounds One, Three, Four, Five, and Six.   Therefore, the Court will review those claims.[11]

### A.   Federal Habeas Review of State Court Decisions

If a habeas petition includes a claim that was "adjudicated on the merits in State court proceedings," federal court review is limited by § 2254(d).  Under § 2254(d)(1), a federal court cannot grant habeas relief unless the petitioner shows: (1) that the state court's decision "was contrary to" federal law as clearly established in the holdings of the United States Supreme Court at the time of the state court decision, *Greene v. Fisher*, __ U.S.__, 132 S. Ct. 38, 43 (2011); or (2) that it "involved an unreasonable application of" such law, § 2254(d)(1); or (3) that it "was based on an unreasonable determination of the facts" in light of the record before the state court.  28 U.S.C. § 2254(d)(2); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011).  This standard is "difficult to meet." *Harrington*, 131 S. Ct. at 786.  It is also a "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law, courts look exclusively to the holdings of the Supreme Court that existed at the time of the state court's decision.  *Greene*, 132 S. Ct. at 44.  A state court's decision is "contrary to" federal law if it applies a rule of law "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and

---

[11]  Although the exhaustion requirement must be expressly waived by the State, 28 U.S.C. § 2254(b)(3), the same is not true of the procedural default defense.  *Franklin v. Johnson*, 290 F.3d at 1230 (rejecting argument that § 2254(b)(3) precludes the application of ordinary implicit waiver rules to the habeas procedural default doctrine); *Francis v. Rison*, 894 F.2d 353, 355 (9th Cir. 1990) (finding that government waived procedural default argument by contending only that the petitioner had failed to exhaust remedies, which is "quite a different argument, of course, from asserting procedural default").

1    nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v.*

2    *Esparza*, 540 U.S 12, 14 (2003) (citations omitted).

3        A state court decision is an "unreasonable application of" federal law if the court

4    identifies the correct legal rule, but unreasonably applies that rule to the facts of a

5    particular case. *Brown v. Payton*, 544 U.S. 133, 141 (2005).  "A state court's

6    determination that a claim lacks merit precludes federal habeas relief so long as

7    'fairminded jurists could disagree on the correctness of the state court's decision.'"

8    *Richter*, 131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

9    "[E]valuating whether a rule application was unreasonable requires considering the rule's

10   specificity.  The more general the rule, the more leeway courts have in reaching outcomes

11   in case-by-case determination." *Id.*

12       When a state court decision is deemed to be "contrary to" or an "unreasonable

13   application of" clearly established federal law, a petitioner is not entitled to habeas corpus

14   relief unless the erroneous state court ruling also resulted in actual prejudice as defined in

15   *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993).  *See Benn v. Lambert*, 283 F.3d 1040,

16   1052 n.6 (9th Cir. 2002).  "Actual prejudice" means that the constitutional error at issue

17   had a "substantial and injurious effect or influence in determining the jury's verdict."

18   *Brecht*, 507 U.S. at 631. "The *Brecht* harmless error analysis also applies to habeas

19   review of an error with respect to sentencing, in other words the test is whether such error

20   had a 'substantial and injurious effect' on the sentence." *Hernandez v. LaMarque*, 2006

21   WL 2411441, at *3 (N.D. Cal., Aug. 18, 2006) (citing *Calderon v. Coleman*, 525 U.S.

22   141, 145-57 (1998) (finding sentencing error harmless because even if the evidence of

23   three prior convictions was insufficient, petitioner was not prejudiced by the court's

24   consideration of those convictions because it found four other prior convictions that

25   would have supported the petitioner's sentence)).  The Court will consider Plaintiff's

26   claims under the applicable standard of review.[12]

27

28       [12]  Because, as discussed in Section III, it is not entirely clear whether Petitioner
     properly exhausted and thus whether the state court adjudicated on the merits the claims

**B.      The Lack of a Hearing on Post-Conviction Review**

In several places in his Petition, Petitioner argues that the post-conviction court erred by failing to hold an evidentiary hearing. (Doc. 1 at 15, 17, 19, 21.) Petitioner's assertion that the post-conviction court erred by declining to hold an evidentiary hearing is a matter of state law that is not cognizable on federal habeas corpus review. *See Valencia v. Ryan*, 2012 WL 1681991 at *8 (D. Ariz. Jan. 9, 2012) ("[T]o any extent that Petitioner's claim is directed to the trial court's denial of an evidentiary hearing during the PCR proceeding, it is well settled that a habeas petition 'alleging errors in the state-post conviction review process is not addressable through habeas corpus proceedings.'") (quoting *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989)).

Petitioner also asserts that because the state court did not hold an evidentiary hearing, its factual findings are not entitled the deference normally afforded a state court's factual findings under 28 U.S.C. § 2254(e)(1). Petitioner's assertion lacks merit because an evidentiary hearing is not a prerequisite to deference under the AEDPA. *See Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) ("We decline to accept [the petitioner's] proposal to inject an 'evidentiary hearing' requirement as a prerequisite to AEDPA deference.").

**C.      Ground One — Voluntariness of Guilty Plea**

In Ground One, Petitioner asserts that his guilty plea was "not knowing, intelligent and voluntary" because it resulted from a coerced "package deal" in violation of the Fourteenth Amendment.[13] (Doc. 1 at 6, 14.) Petitioner states that the prosecution

---

asserted in Grounds One and Five, the Court reviews those claims de novo and under the more deferential standard of § 2254(d). *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (reviewing de novo because the "[state] courts did not reach the merits of [the petitioner's] constitutional claim."). "A decision 'as a matter of state law only' perforce does not constitute an 'adjudication on the merits' of a federal claim, and therefore § 2254(d) [does] not apply." *Ayala v. Wong*, 756 F.3d 656, 663 n.4 (9th Cir. 2014).

[13]   Petitioner also claims that the post-conviction court erred in concluding that the trial court considered all of the factors outlined in *Solano*, 724 P.2d 17 for a package plea offer. Whether the state court correctly determined that the plea agreement and the trial court's colloquy satisfied the requirements of *Solano* is a question of state law that is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a) (a writ of habeas corpus is

"offered a plea deal in which it recommended probation for Joseph Hiland because he had suffered a massive stroke . . . and had other health issues. But the State required as a condition of the plea that all of the other defendants sign on to the plea as a package deal." (*Id.*) Petitioner asserts that he initially opposed the plea agreement because it "pitted the love of father against his son," but says he "ultimately accepted the plea, fearing for his father's helplessness if he were to have to go to prison." (*Id.*)

The post-conviction review court held that Petitioner "entered into a plea agreement of his own accord and repeatedly asserted that he understood both the voluntary nature of that plea and the range of sentencing." (Doc. 15, Ex. AA at 2; BB at 2.) The post-conviction court also held that Petitioner was "fully advised as to the range of possible sentencing and . . . indicated that [he] understood the range of sentencing and answered several times that [he was] not entering into the plea agreement under any type of duress or coercion." (Doc. 15, Ex. AA at 12.) Petitioner's challenge to the voluntariness of his guilty plea lacks merit. Additionally, Petitioner has not shown that the state court's resolution of his claim that his guilty plea was involuntary was based on an unreasonable determination of the facts or that is was contrary to, or based on an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d).

To be valid, a guilty plea must be knowing, voluntary, and intelligent. *United States v. Brady*, 397 U.S. 742, 748 (1970). A guilty plea must represent a voluntary and intelligent choice among alternative courses of action open to a defendant. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985). A plea is "involuntary" if it is the product of threats, improper promises, or other forms of wrongful coercion. *Brady*, 397 U.S. at 750. Prosecutors, however, have wide latitude in negotiating plea deals unless there is "no

---

available "only on the ground that [the petitioner] is in custody in violation of the Constitution or law or treaties of the United States"); *Hendricks v. Vasquez*, 974 F.2d 1099, 1107 (9th Cir. 1992) (whether jury instructions were consistent with state law was "purely an issue of state law" and was "not cognizable on federal habeas.").

probable cause to believe the accused committed an offense defined by statute." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

As discussed in Section I.C, at the change of plea hearing, the trial court conducted an extensive inquiry to confirm that Petitioner entered his guilty plea voluntarily and without coercion.  (Doc. 15, Ex. MM.)  Petitioner affirmed that he read and understood the plea agreement and that his attorney had explained the agreement to him.  (*Id*. at 16.)  He affirmed that, other than what was contained in the plea agreement, no promises, guarantees, or assurances had been made to induce him to enter the plea agreement.  (*Id.*)  He also affirmed that he had not been threatened, forced, or coerced to enter the plea agreement, and that he entered the plea voluntarily for his own individual benefit, and not because a co-defendant would benefit from the plea agreement.  (*Id.* at 17-18, 34-35.)  Petitioner also affirmed that he understood that he was not required to enter the plea agreement just because his co-defendants, including his brother and father, were entering that agreement.  (*Id.* at 17-19, 34-35.)  The record reflects that the trial court recognized that the plea agreement was a package deal, and therefore, it conducted a more extensive inquiry into the voluntariness of Petitioner's guilty plea.  (*Id.* at 33-35.)

Petitioner argues that the plea agreement was coercive because the prosecution promised to recommend probation for Petitioner's father if Petitioner also agreed to plead guilty.  (Doc. 1 at 14-15.)  Although the Supreme Court recognizes that plea offers that include lenient treatment for someone other than the defendant may "pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider," the Court has not addressed the constitutional implications of such package plea agreements.  *Bordenkircher*, 434 U.S. at 365 n.8 (declining to consider "constitutional implications of a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person other than the accused" when evaluating the voluntariness of a guilty plea).  It has also declined to define the "breadth of [the prosecutor's] discretion in fashioning plea agreements."  *Id*. at 365.  The Ninth Circuit has found that package-deal plea bargains do not violate the Constitution and can be a

valuable tool.  *See United States v. Caro*, 997 F.2d 657, 658-660 (9th Cir. 1993) (if the sentencing court is aware that co-defendants are entering into a package deal arrangement and conducts a more careful examination of the voluntariness of the pleas, contingent plea agreements are permissible).  The Ninth Circuit has held that a prosecutor's promise to treat a third party with leniency during plea bargaining is not per se coercive.  *Id*. at 659.

The recommendation of probation for Petitioner's father, as part of the package plea offer in this case, did not render Petitioner incapable of making an individual decision regarding whether to accept the plea and there is no evidence that it was coercive.  *See Doe v. Woodford*, 508 F.3d 563, 572 (9th Cir. 2007) ("We have no doubt that the decision to plead guilty is a difficult one for many defendants, but the fact that one struggles with the decision, and might later even come to regret it, does not render it coerced."); *United States v. Kaczynski*, 239 F.3d 1108, 1115-16 (9th Cir. 2001) ("being forced to choose between unpleasant alternatives is not unconstitutional.").  The trial court was aware that the plea agreement was a package deal and, therefore, conducted a more extensive voluntariness inquiry.  (Doc. 15, Ex. MM at 18, 33.)  Petitioner affirmed that he knew he did not have to accept the plea offer just because his co-defendants, including his father, accepted the offer, and that he entered the plea agreement for his own benefit and not to benefit any of his co-defendants.  (Doc. 15, Ex. MM at 17-19, 34-35.)  Petitioner also affirmed that there was nothing other than "the plea agreement itself and what [he was] looking at there, in terms of the consequences versus going to trial and the consequences or possible outcome there, that [was] influencing [him] to any degree" to enter the plea agreement.  (*Id.* at 35.)

Petitioner's counsel also affirmed that Petitioner was not entering the plea agreement "so that another member of his family [received] a favorable plea."  (*Id.* at 34.)  Counsel also explained that the parties omitted "the accomplice language and the conspiracy language" from the plea agreement "because [Petitioner was] entering the

1   plea agreement for his own actions, it is his own decision." (*Id.*)  Petitioner affirmed that

2   he agreed with counsel's statement. (*Id.*)

3        Based on the record, Petitioner has not shown that his guilty plea was involuntary

4   and has not established a Due Process violation.  Accordingly, this claim lacks merit.

5   Therefore, Petitioner cannot show that the state court's rejection of this claim was based

6   on an unreasonable determination of the facts, or that it was contrary to, or an

7   unreasonable application of, established federal law.   *See*  28 U.S.C. § 2254(d).

8   Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

9        **D.      Ground Four — Judicial Bias**

10        In Ground Four, Petitioner argues that he was denied "fair hearings" and a fair

11   sentencing because the trial court was biased against him.[14]  (Doc. 1 at 9, 17.)  The court

12   denied this claim on post-conviction review, holding that "there [was] no evidence in the

13   record that reflects that Judge Lindberg was biased." (Doc. 15, Ex. BB at 2.)  As set forth

14   below, this claim lacks merit.  Therefore, Petitioner cannot show that this claim was

15   based on an unreasonable determination of the facts, or that it was and was contrary, or

16   based on an unreasonable application of, clearly established federal law. (Doc. 1 at 19.)

17        **1.      Detective Cahall's Letter**

18        To support his claim of judicial bias, Petitioner asserts that the Cahall letter

19   "invoke[ed] a past personal relationship with Judge Lindberg and ask[ed] him to sentence

20   Petitioner harshly based on this prior relationship" and required Judge Lindberg to recuse

21   because of the appearance of impropriety, which Petitioner asserts was sufficient to

22   establish judicial bias under *Taylor v. Hayes*, 418 U.S. 488 (1987).  (Doc. 1 at 17-18.)

23   The post-conviction court rejected this claim stating that there was "no basis in the record

24   to find that Judge Lindberg was biased due to the Cahall letter." (Doc. 15, Ex. AA at 2.)

25   Petitioner has not shown that the state court's resolution of this claim was based on an

26

27   _____

28        [14]  The Court considers Ground Four before Ground Three because the challenge to the Cahall letter asserted in Ground Four is relevant to Ground Three.

1  unreasonable determination of the facts, or that it was contrary to, or an unreasonable

2  application of clearly established federal law.  *See* 28 U.S.C. § 2254(d).

3      Although *Taylor* provides that the appearance of bias can require recusal, the

4  Supreme Court has established three situations in which the appearance of bias, rather

5  than actual bias, requires recusal.  *See Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir.

6  2007) (alterations and citations omitted).  "First, due process requires recusal of a judge

7  who "has a direct personal, substantial pecuniary interest in reaching a conclusion against

8  one of the litigants."  *Id.*  "Second, due process requires recusal if a judge becomes

9  'embroiled in a running, bitter controversy with one of the litigants.'"  *Id.*  "Third, due

10  process requires recusal if the judge acts as 'part of the accusatory process.'"  *Id.*

11      The Cahall letter does not fit within any of these categories.  Moreover, the trial

12  court struck the letter and stated it would not consider that letter in sentencing Petitioner

13  or his co-defendants.  (Doc. 16, Ex. ZZ at 33-34.)  Thus, Petitioner has not shown that the

14  state court's resolution of this claim was contrary to or an unreasonable determination of

15  the facts, or that it was contrary to, or based on an unreasonable application of, clearly

16  established federal law and he is not entitled to habeas corpus relief based on this claim.

17  *See* 28 U.S.C. § 2254(d).

### 2.    The Trial Court's Denial of Motions

19      To support his claim of judicial bias, Petitioner also asserts that Judge Lindberg's

20  denial of various motions evidences his bias and prejudice against Petitioner.[15]  (Doc. 1 at

21  18.)  On the day of sentencing, Petitioner and his codefendants filed several motions

22  seeking to postpone sentencing, disqualify the court and the county attorney's office, and

---

[15]    In addition to challenging Judge Lingberg's denial of motions during the sentencing proceeding, Petitioner argues that Judge Lindberg's denial of his "indigent request for transcripts" to file a petition for post-conviction relief evidences Judge Lindberg's bias against him.  (Doc. 1 at 18.)  Petitioner asserts that the denial of his request for transcripts was contrary to the "universal[]" practice of allowing a defendant to obtain such transcripts.  (*Id.*)  To the extent that Petitioner argues that Judge Lindberg's denial of his request for transcripts violated Arizona law governing post-conviction proceedings, that claim is a matter of state law and is not cognizable on federal habeas corpus review.  *See Franzen*, 877 F.2d at 26.

- 43 –

obtain discovery.  (Doc. 15, Exs. L-N.)  For the most part, these motions were based on the Cahall   letter.  (*Id.*)   Judge Lindberg referred the motion to disqualify to Judge Brutinel.  (Doc. 15, Ex. ZZ at 6-9; Ex. O.)  After Judge Brutinel denied the motion, Judge Lindberg denied the remaining motions and proceeded to sentencing.  (Doc. 15, Ex. AAA at 39-40; Ex. ZZ at 62.)

A defendant is entitled to a fair trial, free from judicial bias.  *In re Murchison*, 349 U.S. 133, 136 (1955).  There is a presumption that judges are unbiased, honest, and have integrity.  *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  Judicial bias may be shown by demonstrating the judge's actual bias, or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity.  *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994).

Judicial rulings alone, however, almost never constitute a valid basis for establishing judicial bias.  *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp*., 384 U.S. 563, 583 (1966)).  "The mere fact that [the court] ruled against [a petitioner] . . . does not constitute a basis for bias."  *Weller v. Montana*, 2012 WL 681545, at *2 (D. Mont. Jan.17, 2012).  Plaintiff has not shown that the trial court's denial of motions that Petitioner and his co-defendants filed immediately before sentencing was based on bias.  The record reflects that the trial court considered arguments from counsel on the motions.  (Doc. 15, Ex. ZZ at 30-62.)  Although the trial court did not elaborate on its rulings, it apparently determined that the Cahall letter, which the trial court struck and did not consider at sentencing, did not warrant further discovery, continuing the trial, or disqualifying the county attorney's office.  (Doc. 16, Ex. ZZ at 62.)  The court also determined that no inquiry into the State's communications with the victims was necessary.  (*Id.*)

The trial court's adverse rulings cited by Petitioner were based on the facts or events that arose during the course of the proceedings before the court and do not evidence bias.  *See Edwards v. Sisto*, 2011 WL 1599632 at *6 (N.D. Cal. Apr. 27, 2011).

- 44 –

1    Similarly, Petitioner has not shown that Judge Lindberg's denial of Petitioner's request

2    for transcripts in relation to the post-conviction proceeding amounted to bias.

3        Therefore, Petitioner has not shown that the state court's rejection of his claim of

4    judicial bias was based on an unreasonable determination of the facts, or that it was

5    contrary to, or based on an unreasonable application of, clearly established federal law.

6    *See* 28 U.S.C. § 2254(d).   Therefore, Petitioner is not entitled to relief on this claim of

7    judicial bias.

8                    **3.       Favoritism toward the Prosecution**

9        To support his judicial bias claim, Petitioner also asserts that Judge Lindberg had

10   "different standards of treatment" for the prosecution and defense during the presentence

11   hearing.  (Doc. 1 at 18.)  To support this claim of bias, Petitioner points to the trial court

12   urging the defense to pick up the pace of it presentation of its case and to the court's

13   statement that defense witnesses could become cumulative.  (*Id.*)  Petitioner also asserts

14   that the trial court refused to allow defense counsel to read from a letter, did not allow

15   defense counsel to ask certain questions, and allowed one of the prosecution's witnesses

16   to read from an exhibit that was not admitted into evidence.  (Doc. 1 at 19.)

17       These incidents do not establish judicial bias.   The trial court's request that

18   defense counsel increase the pace of their presentation (Doc. 16, Ex. WW at 131-33,

19   Ex. XX at 292), its concern about cumulative witnesses (Doc. 16, Ex. WW at 133), and

20   its rulings on the formulation of questions to the witnesses (Doc. 16, Ex. OO at 62) were

21   part of the trial court's management of a lengthy pre-sentence hearing that included

22   twenty witnesses who spoke on behalf of Petitioner and his codefendants.   (Doc. 15,

23   Exs. NN-SS; Doc. 16, Exs. TT-YY.)  Petitioner's conclusory allegations are insufficient

24   to establish that the trial court's management of the presentencing hearing was biased

25   against Petitioner or to establish that he is entitled to habeas corpus relief.  *See James v.*

26   *Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (citation omitted) ("Conclusory allegations which

27   are not supported by a statement of specific facts do not warrant habeas relief.").

28

Additionally, the record reflects that the trial court permitted one of the prosecution's witnesses to read from an exhibit that was not admitted into evidence because the court ruled that the exhibit could only "be used for refreshing recollection purposes."   (Doc. 15, Ex. RR at 59-60.)   Although the trial court later precluded Petitioner's counsel from reading a letter from Terrell Hiland after the State objected on the basis of lack of foundation, it permitted the witness to read the letter and allowed defense counsel to ask questions about the contents of the letter.  (Doc. 16, Ex. WW at 90-95.)   Again, these incidents do not show that the trial court was biased against Petitioner.

Thus, the trial court's management of the pre-sentence hearing does not show judicial bias.  Accordingly, Petitioner has not shown that the state court's resolution of this claim was based on an unreasonable determination of facts, or that it was contrary to, or based on an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d).

## E.    Ground Three — Prosecutorial Misconduct

In Ground Three, Petitioner asserts that the State engaged in prosecutorial misconduct in violation of the Fifth, Sixth, and Fourteenth Amendments.  (Doc. 1 at 16.) Petitioner cites several incidents related to the presentence hearing and sentencing as evidence of prosecutorial misconduct, including the prosecution's (1) submission of the Cahall letter, (2) use of a display board, (3) references to the ACC ruling, (4) alleged victim manipulation, and (5) references to the defendants jointly as "the Hilands." (Doc. 1 at 16-17.)  Petitioner asserts that these alleged instances of misconduct were part of the prosecution's strategy to "compromise Judge Lindberg's ability to proceed with sentencing in an unbiased manner." (*Id.* at 16.)

On post-conviction review, the court found that "nothing in the record [] support[ed] the allegations that the State acted inappropriately."  (Doc. 15, Ex. AA at 3.) The post-conviction court also found there was "no evidence in the record that reflects. . .

1  that the presentation [of evidence during the presentence hearing] was impermissibly

2  distorted by the prosecution."  (Doc. 15, Ex. BB at 2.)

3       The appropriate standard for a claim of prosecutorial misconduct is "the narrow

4  one of due process, and not the broad exercise of supervisory power." *Darden v.*

5  *Wainwright*, 477 U.S. 168, 181 (1986).  To succeed on a claim of prosecutorial

6  misconduct, a petitioner must prove that the prosecutor's remarks were improper and that

7  they so infected the trial with unfairness as to make the resulting conviction a denial of

8  due process.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974); *see also Smith v.*

9  *Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of

10  alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

11  prosecutor.").  A petitioner is not entitled to habeas corpus relief in the absence of a due

12  process violation, even if the prosecutor's comments were "undesirable or even

13  universally condemned." *Donnelly*, 416 U.S. at 642.

14       When evaluating a petitioner's allegations of prosecutorial misconduct, the court

15  "must consider the probable effect of the prosecutor's [conduct] on the jury's ability to

16  judge the evidence fairly."  *United States v. Young*, 470 U.S. 1, 12 (1985).  To make such

17  an assessment, the court must consider the prosecutor's [conduct] in context.  *See Boyde*

18  *v. California*, 494 U.S. 370, 385 (1990); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir.

19  1998).  The Supreme Court has assessed the fairness of a petitioner's trial by considering,

20  among other circumstances, whether the prosecutor manipulated or misstated the

21  evidence, whether the trial court gave a curative instruction, and "the weight of the

22  evidence against the petitioner." *Darden*, 477 U.S. at 181-82.

23                    **1.     The Cahall Letter**

24       Petitioner characterizes the Cahall letter as an improper ex parte communication

25  between the prosecution and Judge Lindberg because it "invok[ed] their personal

26  relationship that derived from their joint efforts in prosecuting a case with similar

27  charges."  (Doc. 1 at 16.)  The record reflects that the Cahall letter was not an ex parte

28  communication.  Rather, the prosecution filed the letter with the trial court and delivered

1   a copy to Petitioner and his co-defendants.  (Doc. 15, Ex. K.)  Additionally, although the

2   Cahall letter referred to a prior, similar case in which Judge Lindberg and Detective

3   Cahall had participated when Judge Lindberg was a prosecutor, as Judge Lindberg noted

4   during sentencing, the letter made a sentencing recommendation based on the

5   circumstances of the case against Petitioner and his co-defendants.  (Doc. 16, Ex. ZZ at

6   33-34.)

7        The prosecution filed the Cahall letter a few days before the sentencing hearing.

8   At the outset of that hearing, the trial court struck the Cahall letter and stated that it would

9   not consider the letter during sentencing.  (*Id.* at 33-34.)  Thus, even if the prosecution's

10  submission of the Cahall letter constituted prosecutorial misconduct, that misconduct did

11  not so infect the proceeding with unfairness as to render Petitioner's sentencing a

12  violation of due process.  *See Maravilla v. Rimmer*, 2009 WL 1689599 at *19 (C.D. Cal.

13  Jun. 12, 2009) (holding that because the court struck an improper comment by

14  prosecutor, it could not be considered to have so infected Petitioner's trial with unfairness

15  as to render his conviction a violation of due process).  Accordingly, this claim lacks

16  merit and Petitioner cannot show that the state court's resolution of this claim was based

17  on an unreasonable determination of the facts, or that it was contrary to, or based on an

18  unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d).

19              **2.      Reference to the ACC Ruling**

20       To further support his claim of prosecutorial misconduct, Petitioner asserts that the

21  prosecution committed misconduct by referring to the 2001 cease-and-desist order issued

22  by the ACC, which ordered Petitioner and his co-defendants to stop their business

23  operations.  (Doc. 1 at 17, Doc. 1, Ex. B.)  The post-conviction court rejected this claim,

24  noting that the trial court indicated that it viewed the ACC documentation as background

25  information for purposes of sentencing.  (Doc. 15, Ex. AA at 2.)  The court also found

26  that the prosecution's presentation during the presentence hearing was not improper and

27  did not bias the trial court.  (*Id.*, Ex. BB at 2.)

28

Before trial, the trial court precluded the admission of portions of the ACC ruling. (Doc. 15, Ex. B.)  Although the trial court's ruling only precluded portions of the ACC ruling, Petitioner does not identify the prosecution's references to the ACC ruling to which he objects. (Doc. 1 at 17.)  Rather, he asserts that the prosecution "presented all of the ACC findings."  (*Id.*)  Even assuming the prosecution presented the entire ACC ruling, that conduct was not prosecutorial misconduct because the trial court's pretrial ruling regarding the ACC ruling did not apply to sentencing.  Specifically, under the Arizona Rules of Criminal Procedure, any party at the presentence hearing "may introduce any reliable, relevant evidence, including hearsay, in order to show aggravating or mitigating circumstances . . . ."  Ariz. R. Crim. P. 26.7(b).  Thus, the prosecution's reference to the ACC ruling during the presentencing hearing was not prosecutorial misconduct. *See Williams v. New York*, 337 U.S. 241, 246 (1949) (a sentencing judge has wide discretion in determining what sources and types of information can be used to assist in determining the proper sentence).

Moreover, even if the prosecution's references to the ACC ruling was improper, the trial court indicated that it gave this information little weight, stating that, "my view of the ACC stuff is that it provides kind of a background for where we are.  I don't think it is — despite its allegation as an aggravating factor, I am not considering it as an aggravating factor."  (Doc. 15, Ex. ZZ at 143-44.)  Thus, even assuming the prosecution's references to the ACC ruling constituted misconduct, that conduct did not so infect the sentencing proceeding with unfairness as to make the resulting sentencing a denial of due process. *See Donnelly*, 416 U.S. at 645.

### 3.      Victim Manipulation

Petitioner also alleges that the prosecution committed misconduct by manipulating the victims and by "soliciting" the victims who testified in the presentence hearing to make separate impact statements and sentencing allocutions in the form of written letters. (Doc. 1 at 16.)  Petitioner asserts that the "letters were highly improper and were only

1    meant to have a negative emotional impact on the judge." (*Id.*) The post-conviction

2    court rejected this claim. (Doc. 15, Exs. AA, BB.)

3          Petitioner asserts that the majority of victims who testified at the presentence

4    hearing testified only that they wanted to recover their money. However, the victims'

5    letters requested that the trial court sentence Petitioner and his co-defendants to prison.

6    (Doc. 1 at 16.) Petitioner suggests that the prosecution manipulated the victims to request

7    prison in their victim letters. (*Id.*) However, he does not provide any support for this

8    assertion and his conclusory, speculative claim does not warrant habeas corpus relief.

9    *See Jones*, 66 F.3d at 204. Thus, Petitioner has not shown that the state court's denial of

10    this claim of prosecutorial misconduct was based on an unreasonable determination of the

11    facts, or that it was contrary to, or based on an unreasonable application of, clearly

12    established federal law. *See* 28 U.S.C. § 2254(d).

13                **4.      Use of Display Board**

14          Petitioner also asserts that the prosecution's use of a display board during the

15    presentence hearing constituted prosecutorial misconduct. (Doc. 1 at 17.) Petitioner

16    argues that the prosecutor used the display board as a visual aid to link the victims to

17    defendants "in a manner that was arbitrary and often inaccurate." (*Id.*) Petitioner claims

18    that the display board misled the trial court and the witnesses who were in the courtroom,

19    but who had not yet testified, regarding the scope of the alleged scheme and Petitioner's

20    involvement in that scheme, and suggested the existence of a conspiracy to which

21    Petitioner had not pleaded guilty. (*Id.*) The court rejected this claim on post-conviction

22    reviewing finding no evidence that the presentation at the presentence hearing "was

23    impermissibly distorted by the prosecution." (Doc. 15, Ex. BB at 2.)

24          The prosecutor used a visual aid to illustrate the financial transactions in a case

25    involving four defendants and over twenty victims. (Doc. 15, Ex. A.) Petitioner

26    generally asserts that the prosecution used the display board to link the victims to the

27    defendants in an arbitrary and inaccurate manner. However, he does not identify the

28

1   inaccuracies allegedly depicted on the display board.   (Doc. 1 at 17.)   Petitioner's

2   conclusory allegations do not warrant habeas corpus relief.   *See Jones*, 66 F.3d 204.

3   Additionally, even if the manner in which the prosecutor used the display board

4   was misconduct, Petitioner has not shown that the misconduct so infected the sentencing

5   proceeding as to violate due process.   *See Donnelly*, 416 U.S. at 645.   Petitioner does not

6   deny his involvement with the Rutledges or Wanda Orr, the victims to whom the court

7   and his counsel specifically referenced at sentencing.   (Doc. 15, Ex. ZZ at 130-131, 145.)

8   Nor does he deny that he engaged in marketing for the fraudulent scheme in which he

9   participated, another factor the court considered in sentencing Petitioner.   (*Id.* at 141-42.)

10   Thus, the record does not support Petitioner's assertion that the prosecution's use of the

11   display board violated his due process rights.   Accordingly, this claim lacks merit and

12   Petitioner cannot show that the state court's resolution of this claim was based on an

13   unreasonable determination of the facts, or that it was contrary to, or based on an

14   unreasonable application of, clearly established federal law.   *See* 28 U.S.C. § 2254(d).

### 5.   Reference to the Defendants as "the Hilands"

16   Finally, Petitioner argues that the prosecution engaged in misconduct by referring

17   to him and his co-defendants — his brother Tyson Hiland, and his father Joseph Hiland

18   — as "the Hilands."   (Doc. 1 at 17.)   Petitioner claims that this misled the court and the

19   witnesses as to each defendant's individual culpability and suggested a conspiracy that

20   did not exist.   (*Id.*)   Petitioner does not cite any specific portion of the record in which the

21   prosecutor made an allegedly misleading reference to "the Hilands."   (*Id.*)

22   However, to the extent that the prosecution referred to Petitioner, his brother, and

23   his father as "the Hilands," it was not improper because Petitioner and the co-defendants

24   are members of the Hiland family, and the record reflects that they all had a role in the

25   business operations.   Additionally, they were indicted, pleaded guilty, and sentenced

26   together. (Doc. 15, Ex. A, Ex. MM; Doc. 16, Ex. ZZ.)

27   Regardless of whether the prosecution referred to the defendants as the Hilands,

28   the record also reflects that the trial court considered Tyson's, Joseph's, and Petitioner's

culpability separately during the sentencing proceedings.  (Doc. 15, Ex. ZZ at 116, 122-23, 130-34, 140-41, 151-52, 163.)  The court also acknowledged that Petitioner did not have the same level of culpability as the other defendants, and imposed a prison sentence that was one-year shorter than the prison sentences imposed on Tyson and Cotrell. (Doc. 15, Ex. ZZ at 142-145, 163.)  Accordingly, even if the prosecution's reference to the Hilands collectively was misconduct, it did not so infect the sentencing proceeding as to deny Petitioner due process.  *See Donnelly*, 416 U.S. at 645.

Petitioner has not established a due process violation based on the alleged instances of prosecutorial misconduct.  Therefore, this claim fails on the merits and Petitioner cannot show that the state court's denial of his claims of prosecutorial misconduct, individually or cumulatively, was based on an unreasonable determination of the facts, or that it was contrary to, or based on an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to habeas corpus relief based on his claims of prosecutorial misconduct.

**F.     Ground Five — Double Punishment**

In Ground Five, Petitioner asserts that the trial court violated his Fifth Amendment right against double jeopardy by imposing consecutive sentences of probation for fraudulent schemes and imprisonment for theft.  (Doc. 1 at 19, Doc. 28.)  Petitioner also cites state law to support his challenge to his consecutive sentences.  (Doc. 1 at 20.) Petitioner claims that the consecutive sentences violated his right against double jeopardy "because the two offenses were based on identical operative facts — they both involved obtaining the same money through the same instance of material misrepresentation — yet the Petitioner was sentenced to two consecutive sentences."  (Doc. 1 at 19.)

**1.     Consecutive Sentences**

The Double Jeopardy Clause protects defendants against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.  *Ohio v. Johnson*, 467 U.S. 493, 498 (1984) (citations omitted).  "The applicable rule is that, where the same act

or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Thus, a defendant may not be convicted or punished for both an offense and its lesser included offense, because they are considered the "same offense" for double jeopardy purposes. *Brown v. Ohio*, 432 U.S. 161, 168 (1977) (concluding that a conviction for both greater and lesser included offense violated the double jeopardy under *Blockburger* test).[16]

However, even if two statutes proscribe the same conduct under the *Blockburger* test, the Double Jeopardy Clause does not prohibit the imposition, in a single trial, of cumulative punishments so long as it does not contradict legislative intent. *See Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983); *see also Brimmage v. Sumner*, 793 F.2d 1014, 1015 (9th Cir. 1986) (citing *Hunter*, 459 U.S. at 368–369); *Clem v. Schriro*, 2007 WL 3231957 (D. Ariz. Nov. 1, 2007) (citing *Hunter*, 459 U.S. at 368-369). Therefore, "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Hunter*, 459 U.S. at 365. This is because "[l]egislatures, not the courts, prescribe the scope of punishments." *Id.* at 368.

Arizona Revised Statute § 13-116 provides that "[a]n act or omission which is made punishable in different ways by different sections of the laws may be punishable under both, but in no event may the sentences be other than concurrent." Accordingly, Arizona law authorized multiple punishments in this case, if fraudulent schemes and theft are multiple acts.

---

[16] In *Brown*, the Court explained that Ohio law defined joyriding as a lesser included offense of auto theft. 432 U.S. at 167-68 ("Joyriding consists of taking or operating a vehicle without the owner's consent, and auto theft consists of joyriding with the intent permanently to deprive the owner of possession."). In contrast, the Arizona legislature has not defined theft as the lesser included offense of fraudulent schemes, *see* Ariz. Rev. Stat. § 13-2310 and Ariz. Rev. Stat. § 13-1802, even though in some instances a conviction for fraudulent schemes could also support a conviction for theft. *See State v. Johnson*, 880 P.2d 132, 135 (Ariz. 1994).

Consistent with *Blockburger*, the Arizona courts determine whether a defendant's conduct is a single act by applying the identical elements test, which requires the court to consider "the facts of each crime separately, subtracting from the factual transaction the evidence necessary to convict on the ultimate charge — the one that is at the essence of the factual nexus and that will often be the most serious of the charges. If the remaining evidence satisfies the elements of the other crime, then consecutive sentences may be permissible under A.R.S. § 13-116." *State v. Gordon*, 778 P.2d 1204, 1211 (Ariz. 1989). When applying this analytical framework, the court "then considers whether, given the entire 'transaction,' it was factually impossible to commit the ultimate crime without also committing the secondary crime. If so, then the likelihood will increase that the defendant committed a single act under A.R.S. § 13–116." *Id.* Finally, the court considers "whether the defendant's conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime. If so, then ordinarily the court should find that the defendant committed multiple acts and should receive consecutive sentences." *Id.* As long as two of the three prongs result in favor of the crimes being separate acts, then consecutive sentences are permissible. *State v. Uriquidez*, 138 P.3d 1177, 1179 (Ariz. Ct. App. 2006).

Here, the post-conviction court applied the *Gordon* test. The court concluded that fraudulent schemes was the "ultimate crime" because the level of manipulation required to commit this crime made it more serious than theft. (Doc. 15, Ex. AA at 9.) The court further found that Petitioner violated the fraudulent schemes statute by inducing the victims to trust in the existence of valuable investments, thus obtaining a benefit for purposes of Ariz. Stat. § 13-2310(A). (Doc. 15, Ex. AA at 9.) Petitioner then received money from the victims and kept that money for his own gain in violation of the theft statute. (*Id.*) Thus, the post-conviction court concluded that the fraud schemes and theft were separate acts. (*Id.*) Accordingly, § 13-116 authorized consecutive sentences. To the extent that Petitioner challenges the state court's application of § 13-116 and *Gordon*, and argues that his consecutive sentences violate Arizona law (Doc. 1 at 20, Doc. 28), his

- 54 –

1    claims are not cognizable on federal habeas corpus review.  *See Engle v. Isaac*, 456 U.S.

2    107, 119 (1982).

3         Moreover, Petitioner has not shown that theft and fraudulent schemes are the same

4    act under the *Blockburger* test.  Under Arizona law, to prove that a defendant committed

5    the crime of theft, the state must prove that a defendant knowingly and without lawful

6    authority "(1) control[led] the property of another with the intent to deprive the other

7    person of such property; or (2) convert[ed] for an unauthorized term or use" another

8    person's property which was entrusted to him; or "(3) obtain[ed] services or property of

9    another by means of any material misrepresentation with the intent to deprive the other

10   person of such property or services."  Ariz. Rev. Stat. § 13-1802A(1)-(3).

11        To prove that a defendant committed the crime of fraudulent schemes, the state

12   must prove that the defendant acted "pursuant to a scheme or artifice to defraud," and

13   "knowingly obtained *any benefit* by means of false or fraudulent pretenses,

14   representations, promises, or material omissions . . . ."  Ariz. Rev. Stat. § 13-2310(A)

15   (emphasis added).  A "'scheme or artifice' is some 'plan, device or trick' to perpetrate a

16   fraud.  The scheme need not be fraudulent on its face but 'must involve some sort of

17   fraudulent misrepresentations or omissions reasonably calculated to deceive persons of

18   ordinary prudence and comprehension.'"  *State v. Henry*, 68 P.3d 455, 458 (Ariz. Ct.

19   App. 2003) (internal citations omitted).  The statute is broadly construed "to cover all of

20   the varieties made possible by boundless human ingenuity."  *Id.*  A "benefit" is defined as

21   "anything of value or advantage, present or prospective."  Ariz. Rev. Stat. § 13-105(3).  It

22   includes more than just money or property.  *Henry*, 68 P.3d at 459.

23        Thus, to establish theft, the prosecution must prove that a defendant controlled,

24   converted or obtained the *services* or *property* of another, but these elements are not

25   required to convict a defendant of fraudulent schemes.  *Compare* Ariz. Rev. Stat. § 13-

26   1802A(1)-(3) *with* Ariz. Rev. Stat. § 13-2310(A).  To be guilty of fraudulent schemes the

27   defendant must have acted pursuant to a scheme or artifice to defraud, which is not an

28   element of theft.  *See Arizona v. Johnson*, 880 P.2d 132, 38 (Ariz. 1994) (stating that "the

fraud statute explicitly requires an additional element — a false pretense — that is not necessary to prove theft.")  Additionally, because a defendant may violate the fraudulent schemes statute by obtaining "any benefit," not just property or a service, a defendant who violates the fraudulent schemes statute does not necessarily violate the theft statute.

Thus, theft and fraudulent schemes do not constitute the same offense for double jeopardy purposes.  *See State v. Harper*, 868 P.2d 1027, 1029 (Ariz. Ct. App. 1993) (noting that, although defendant stole the money he subsequently laundered, he could have committed either offense without committing the other); *State v. Rigdeley*, 2008 WL 5244943, at *7 (Ariz. Ct. App. Dec. 16, 2008) (concluding that theft and fraudulent schemes were considered multiple acts and could be punished by consecutive sentences). Therefore, Petitioner's consecutive sentences do not violate the Double Jeopardy Clause and he is not entitled to habeas corpus relief on this claim.  *See Hunter*, 459 U.S. 359.

## 2.    Consideration of Pecuniary Gain as an Aggravating Factor

Petitioner also claims that the trial court violated his Fifth Amendment right against Double Jeopardy by considering pecuniary gain as an aggravating circumstance because "insofar as pecuniary gain is an element of both offenses, the court's double use of it as an aggravator violated the Double Jeopardy [Clause]."  (Doc. 1 at 20.)

Contrary to Petitioner's assertion, under Arizona law pecuniary gain is not necessarily an element of either theft or fraudulent schemes.  *See* Ariz. Rev. Stat. § 13-1802A(1)-(3) (defining theft and referring only to "property" or services); Ariz. Rev. Stat. § 13-2310(A) (defining fraudulent schemes and referring to "any benefit"); *see also State v. Fagnant*, 839 P.2d 430, 434 (Ariz. Ct. App. 1992) *vacated on other grounds*, 860 P.2d 485 (Ariz. 1993) ("'pecuniary gain' is not an essential or irreducible element of [the Arizona fraudulent schemes statute], since a 'benefit' may be 'anything of value' either pecuniary or non-pecuniary.").  Additionally, the Supreme Court has held that "the Double Jeopardy Clause is not implicated by the Government's pursuit of a statutory aggravator because '[a]ggravating circumstances are not separate penalties or offenses.'" *Poland v. Arizona*, 476 U.S. 147, 156 (1986) (holding that "the Double Jeopardy Clause

1   is not implicated by the Government's pursuit of a statutory aggravators because

2   '[a]ggravating circumstances are not separate penalties or offenses'").

3        Accordingly, the trial court's consideration of pecuniary gain as an aggravating

4   factor did not violate the Double Jeopardy Clause.  Additionally, Petitioner has not

5   shown that the state court's resolution of this claim was based on an unreasonable

6   determination of the facts, or that it was contrary to, or based on an unreasonable

7   application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d).

8        **G.    Ground Six — Consideration of Aggravating and Mitigating Factors**

9        In Ground Six, Petitioner argues that the trial court improperly considered

10  aggravating and mitigating factors in violation of the Fifth, Sixth and Fourteenth

11  Amendments.  (Doc. 1 at 20.)  Petitioner asserts that he was only a "salaried employee

12  who had received $70,000/year both prior to and during the indictment period" and "[h]e

13  received no pecuniary gain as a result of his actions" and, therefore, he argues that the

14  trial court improperly determined that he received a pecuniary gain.  (*Id*.)  Additionally,

15  because the trial court gave Petitioner a prison sentence that was only one year shorter

16  than the sentences imposed on Tyson and Cottrell, Petitioner argues that the trial court

17  "failed to properly consider Petitioner's minor role in the scheme."[17]  Petitioner raised

18  these claims on post-conviction review, and the court held that:

> The record shows that Judge Lindberg went to great lengths
> to avail himself of the aggravating and mitigating
> circumstances in each individual case.  There is nothing in the
> record that shows that Judge Lindberg failed to consider
> mitigating factors in this case.  Aggravated sentences were
> not improper under law in this case and any disparity in
> sentencing was considered and explained on the record.

23  (Doc. 15, Ex. AA at 10.)  As discussed below, Petitioner has not shown that the state

24  court's resolution of this claim was based on an unreasonable determination of the facts,

---

[17]  Petitioner also asserts that Ariz. Rev. Stat. § 13-701(E)(4) required the court to mitigate his sentence because his participation in the scheme was minor.  The interpretation and application of Arizona's sentencing laws is a matter of state law that is not amenable to federal habeas corpus review.  *See Estelle*, 502 U.S. at 67-68.

1    or that it was contrary to, or based on an unreasonable determination of, clearly

2    established federal law.  *See* 28 U.S.C. § 2254(d).

3    State "[s]entencing courts must have wide latitude in their decisions as to

4    punishment," and federal courts generally may not review a sentence that falls within

5    statutory limits.  *Walker v. Endell*, 850 F.2d 470, 476 (9th Cir. 1987).  However, the

6    habeas court may vacate a sentence that violates due process.  *Id.*  The plea agreement

7    provided that Petitioner could be sentenced to as little as probation or as much as twelve-

8    and-one-half years' imprisonment for each offense.  (Doc. 15, Ex. F at 1-2, 4.)  The trial

9    court sentenced Petitioner to nine years' imprisonment for theft and to a seven-year term

10   of probation for fraudulent schemes.  (Doc. 15, Ex. Q.)  These sentences were consistent

11   with the plea agreement and were authorized by Arizona law.  *See* Ariz. Rev. Stat. §§ 13-

12   1802, 13-701, 13-702, 13-702.01, 13-801 and Ariz. Rev. Stat. §§ 13-2310, 13-303.

13   By asserting that the trial court did not properly consider his allegedly minor role

14   in the scheme, or treat his pecuniary gain as a "salary," Petitioner may be claiming that

15   the trial court did not properly individualize or mitigate his sentence.  The Supreme

16   Court, however, has declined to hold that the Constitution requires individualized

17   sentencing outside of the context of capital sentencing, even when a defendant is

18   sentenced to life in prison without parole.  *See Harmelin v. Michigan*, 501 U.S. 951, 995

19   (1991) (refusing to extend the "individualized capital-sentencing doctrine," outside of the

20   capital context, "because of the qualitative difference between death and all other

21   penalties.").

22   Moreover, the trial court considered whether Petitioner deserved leniency because

23   of his lesser role in the scheme, but concluded that he was still responsible for victims'

24   losses.  The court stated:

25           I look at the list of victims and granting that Travis' main
             responsibility was marketing and not the direct sales like
26           Tyson and others . . . , the marketing had a fair share of the
             fraud activities, and I will grant that the information was
27           coming from Joe [] and from . . .Cottrell.  But I don't think it
             negates the responsibility that [Travis] himself had to do the
28

> due diligence, to follow through, to not falsify or misrepresent
> anything to these folks about the safety of their investment.

(Doc. 15, Ex. ZZ at 142.)

The trial court determined that Petitioner's involvement in marketing, rather than direct sales, warranted making his prison sentence for theft one year less than that of Stephen Cotrell and Tyson Hiland.  (Doc. 15, Ex. Q; Doc. 16, Ex. ZZ at 91, 161.)

The trial court also considered and rejected Petitioner's claim that the money he obtained amounted to a reasonable "salary."  The court stated:

> The value just of what he received was over $100,000.  You
> say it is only $65,000 a year.  But it's $65,000 a year that he
> is imputed with knowledge is coming from the investments.
> There isn't going to be a return on the investments, and he
> kept selling or working in the sales of it after a point where he
> knew there wasn't going to be a sufficient outcome.

(*Id.* at 143.)

The record reflects that the trial court considered Petitioner's role in the scheme and his argument that the money he received was a salary, as opposed to a pecuniary gain.  The record does not support Petitioner's assertion that the trial court's imposition of sentence violated the Due Process Clause.  Additionally, Petitioner has not shown that the state court's rejection of the sentencing claims raised in Ground Six was based on an unreasonable determination of the facts, or that it was contrary to, or based on an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to relief based on this claim.

**IV.   Request for an Evidentiary Hearing**

Petitioner requests an evidentiary hearing.  (Doc. 1.)  Under 28 U.S.C. § 2254(e)(2), a petitioner is entitled to an evidentiary hearing if he presents a "meritorious claim" and he exercised reasonable diligence in developing the factual record in the state proceedings.  *Williams v. Taylor*, 529 U.S. 420, 434-37 (2000).  A petitioner exercises the diligence necessary to preserve a claim if "the prisoner made a

1  reasonable attempt, in light of the information available at the time, to investigate and

2  pursue claims in state court." *Id.* at 435.

3       Thus, to qualify for an evidentiary hearing, Petitioner must both: "(1) allege facts

4  which, if proven, would entitle him to relief, and (2) show that he did not receive a full

5  and fair hearing in a state court, either at the time of the trial or in a collateral

6  proceeding." *Belmontes v. Brown*, 414 F.3d 1094, 1124 (9th Cir. 2005). No hearing is

7  necessary, however, if this Court "is able to determine without a hearing that the

8  allegations are without credibility or that the allegations if true would not warrant a new

9  trial . . . ." *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir.1991); *cf.*

10  *Siripongs v. Calderon*, 35 F.3d 1308, 1314 (9th Cir. 1994) (In a capital case, a habeas

11  petitioner who asserts a colorable claim to relief, and who has never been given the

12  opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing

13  in federal court.).

14       Based on its review of Petitioner's claims, as set forth above, the Court finds that

15  Petitioner has not made any allegations that, if true, would warrant habeas relief, and

16  finds that his allegations (particularly his allegations related to the voluntariness of his

17  guilty plea asserted in Grounds One and Two, ), are without credibility. Accordingly, an

18  evidentiary hearing is not warranted.

19  **V.**    **Conclusion**

20       The Petition should be denied because Petitioner's claims are either procedurally

21  defaulted and barred from review or lack merit.

22       Accordingly,

23       **IT IS RECOMMENDED** that the Petition for Writ of Habeas Corpus (Doc. 1) be

24  **DENIED**.

25       **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and

26  leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the

27  Petition is justified by a plain procedural bar and reasonable jurists would not find the

28

1   procedural ruling debatable or because Petitioner has not made a substantial showing of

2   the denial of a constitutional right.

3        This recommendation is not an order that is immediately appealable to the Ninth

4   Circuit Court of Appeals.  Any notice of appeal pursuant to Federal Rule of Appellate

5   Procedure 4(a)(1), should not be filed until entry of the District Court's judgment.  The

6   parties have fourteen days from the date of service of a copy of this recommendation

7   within which to file specific written objections with the Court.  *See* 28

8   U.S.C. § 636(b)(1); Fed. R. Civ. P. 6 and 72.  Thereafter, the parties have fourteen days

9   within which to file a response to the objections.  Failure to file timely objections to the

10  Magistrate Judge's Report and Recommendation may result in the District Court's

11  acceptance of the Report and Recommendation without further review.  *See United States*

12  *v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to file timely objections to

13  any factual determination of the Magistrate Judge may be considered a waiver of a

14  party's right to appellate review of the findings of fact in an order or judgment entered

15  pursuant to the Magistrate Judge's recommendation.  *See* Fed. R. Civ. P. 72.

16       Dated this 21st day of January, 2015.

17

18

19       _____

20       Bridget S. Bade
         United States Magistrate Judge

21

22

23

24

25

26

27

28